Argued and submitted September 28, 2010, reversed and remanded
July 13, 2011

## 1000 FRIENDS OF OREGON,
Friends of Yamhill County
and Ilsa Perse,
*Petitioners,*

*v.*

## LAND CONSERVATION AND
DEVELOPMENT COMMISSION
and City Of McMinnville,
*Respondents.*

Land Conservation and Development Commission
06WKTASK001709, 08WKTASK001760
A134379

259 P3d 1021

Mary Kyle McCurdy argued the cause and filed the briefs for petitioners.

Steven Shipsey, Assistant Attorney General, argued the cause for respondent Land Conservation and Development Commission. On the brief were John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Denise G. Fjordbeck, Attorney-in-Charge Civil/Administrative Appeals.

Jeffrey G. Condit argued the cause for respondent City of McMinnville. With him on the brief was Miller Nash LLP.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

SERCOMBE, J.

## SERCOMBE, J.

This case concerns whether the Land Conservation and Development Commission (LCDC or commission) erred in approving a large expansion of the urban growth boundary (UGB) of the City of McMinnville (city). A UGB is the part of the land use map in a city's comprehensive plan that demarcates the area around a city that is available for expansion and future urban uses. Here, the city proposed to expand its UGB in various directions by several hundred acres and to redesignate the included territory for different types of urban uses, including neighborhoods of integrated commercial and higher-density residential land. Most of the included acreage is high-quality agricultural land that was previously zoned for exclusive farm uses. The primary issue in this case is whether ORS 197.298, a statute that prioritizes the types of land that can be added to a UGB, requires that other territory—land not designated for agricultural use or lower-quality farmland—be added to the UGB instead of some of the high-quality agricultural land. We conclude that LCDC erred in its application of ORS 197.298 and that a correct application of the law could compel a different result. We therefore reverse the order under review and remand the case to LCDC for further action under a correct interpretation of the governing standards.

## I. BACKGROUND

The parties to this case differ as to the meaning of the standards that apply to UGB changes that result from periodic review of the city's comprehensive plan. In order to better frame the contentions of the parties and the history of the proceedings, we begin by describing the legal framework for regulation of the future uses of land around an incorporated city and the periodic review planning process used to adopt those regulations. ORS 197.175(1) requires cities and counties to exercise their planning and zoning responsibilities in accordance with state land use statutes and special rules (goals) approved by LCDC. ORS 197.175(2) specifically directs that each city and county "adopt, amend and revise comprehensive plans in compliance with goals approved by [LCDC]." The LCDC goals, in turn, set out substantive standards for the content of comprehensive plans. However, a city

or county can take an "exception" to the application of a goal to particular property regulated by the comprehensive plan.

We recently described the relationship of the goals and the exception process in *Waste Not of Yamhill County v. Yamhill County*, 240 Or App 285, 287-89, 246 P3d 493 (2010), *adh'd to as modified on recons*, 241 Or App 199, 255 P3d 496 (2011):

"Some of those goals require plans to restrict the use or development of different types of resource lands, *e.g.*, Goal 3 (Agricultural Lands), OAR 660-015-0000(3), and Goal 4 (Forest Lands), OAR 660-015-0000(4). When a city or county wishes to adopt a property-specific plan provision that is inconsistent with a goal requirement, it approves an exception to that goal requirement as part of the compre-hensive plan. * * *

"ORS 197.732(2) [and Goal 2, Part II] * * * describe[ ] three types of exceptions: for physically developed land that is not available for the goal use; for land that is 'irrevocably committed' to a nongoal use; and for land needed for a use not allowed by a goal policy. The latter type of exception, a 'reasons' or 'need' exception is allowed by ORS 197.732(2)(c) [and Goal 2]:

" 'A local government may adopt an exception to a goal if:

" '* * * * *

" '(c)   The following standards are met:

" '(A)   Reasons justify why the state policy embod-ied in the applicable goals should not apply;

" '(B)   Areas that do not require a new exception cannot reasonably accommodate the use;

" '(C)   The long term environmental, economic, social and energy consequences resulting from the use at the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and

" '(D)  The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts.' "

Thus, when a city amends its comprehensive plan, including any amendment to its UGB, the city must justify the change as being consistent with the LCDC goals, except to the extent that compliance with a goal is excused by an exception to its application.

Goal 14 (Urbanization), OAR 660-015-0000(14), provides particular standards for setting or changing a UGB:[1]

"Urban growth boundaries shall be established to identify and separate urbanizable land from rural land. Establishment and change of the boundaries shall be based upon considerations of the following factors:

"(1)  Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

"(2)  Need for housing, employment opportunities, and livability;

"(3)  Orderly and economic provision for public facilities and services;

"(4)  Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5)  Environmental, energy, economic and social consequences;

"(6)  Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

"(7)  Compatibility of the proposed urban uses with nearby agricultural activities.

"The results of the above considerations shall be included in the comprehensive plan. In the case of a change

---

[1] The provisions of Goal 14 were amended by LCDC on April 28, 2005. The amendments allow local governments "that initiated an evaluation of the [UGB] land supply prior to April 28, 2005, and consider[ed] an amendment of the UGB based on that evaluation" to apply the former version of Goal 14 to that amendment. The city applied the former version of Goal 14. All references to Goal 14 and its implementing regulations in this opinion pertain to the former Goal 14 and the regulations in effect prior to the goal amendments, unless otherwise noted.

of a boundary, a governing body proposing such change in the boundary separating urbanizable lands from rural land, shall follow the procedures and requirements as set forth in the Land Use Planning goal (Goal 2) for goal exceptions."

The referenced Goal 2 standards for exceptions are to the exception standards noted above. 244 Or App at 242-43.

ORS 197.298 supplements the Goal 14 criteria used to justify a UGB change. The statute requires that land be added to a UGB in a priority sequence:

"(1)   In addition to any requirements established by rule addressing urbanization, land may not be included within an urban growth boundary except under the following priorities:

"(a)   First priority is land that is designated urban reserve land under ORS 195.145, rule or metropolitan service district action plan.

"(b)   If land under paragraph (a) of this subsection is inadequate to accommodate the amount of land needed, second priority is land adjacent to an urban growth boundary that is identified in an acknowledged comprehensive plan as an exception area or nonresource land. Second priority may include resource land that is completely surrounded by exception areas unless such resource land is high-value farmland as described in ORS 215.710.

"(c)   If land under paragraphs (a) and (b) of this subsection is inadequate to accommodate the amount of land needed, third priority is land designated as marginal land pursuant to ORS 197.247 (1991 Edition).

"(d)   If land under paragraphs (a) to (c) of this subsection is inadequate to accommodate the amount of land needed, fourth priority is land designated in an acknowledged comprehensive plan for agriculture or forestry, or both.

"(2)   Higher priority shall be given to land of lower capability as measured by the capability classification system or by cubic foot site class, whichever is appropriate for the current use.

"(3)   Land of lower priority under subsection (1) of this section may be included in an urban growth boundary if

land of higher priority is found to be inadequate to accommodate the amount of land estimated in subsection (1) of this section for one or more of the following reasons:

"(a)   Specific types of identified land needs cannot be reasonably accommodated on higher priority lands;

"(b)   Future urban services could not reasonably be provided to the higher priority lands due to topographical or other physical constraints; or

"(c)   Maximum efficiency of land uses within a proposed urban growth boundary requires inclusion of lower priority lands in order to include or to provide services to higher priority lands."

Thus, ORS 197.298(1) requires that the statutory priorities be applied to UGB amendments "[i]n addition to any requirements established by rule addressing urbanization," *i.e.*, Goal 14 and its implementing administrative rules. The priority statute directs the application of different, but somewhat analogous, factors in approving UGB changes than those mandated by Goal 14. This case raises questions about the fit between Goal 14 and ORS 197.298: whether Goal 14 is applied to the classification of lands as eligible for prioritization under ORS 197.298, how Goal 14 works in determining whether higher-priority land is "inadequate to accommodate the amount of land needed," and the ways the two policies are otherwise integrated in their application.

One final legal setting is worthy of discussion at this point. The plan amendments in this case arose in the context of "periodic review" of the city's comprehensive plan. The statutes that define the periodic review process provide context to an understanding of the demands of Goal 14 and ORS 197.298 when a UGB is changed as part of a plan update.

Once a local comprehensive plan has been approved or "acknowledged" by LCDC as consistent with the statewide planning goals, ORS 197.628(1) requires that the plan and implementing land use regulations be periodically updated

"to respond to changes in local, regional and state conditions to ensure that the plans and regulations remain in

compliance with the statewide planning goals adopted pursuant to ORS 197.230, and to ensure that the plans and regulations make adequate provision for economic development, needed housing, transportation, public facilities and services and urbanization."

ORS 197.296 specifies particular work tasks for larger cities during periodic review to accommodate demand for new housing. A locality must "demonstrate that its comprehensive plan * * * provides sufficient buildable lands within the urban growth boundary * * * to accommodate estimated housing needs for 20 years." ORS 197.296(2). To do this, ORS 197.296(3) requires that a local government shall

"(a)   Inventory the supply of buildable lands within the urban growth boundary and determine the housing capacity of the buildable lands; and

"(b)   Conduct an analysis of housing need by type and density range, in accordance with ORS 197.303 and statewide planning goals and rules relating to housing, to determine the number of units and amount of land needed for each needed housing type for the next 20 years."

If the housing need determined under ORS 197.296(3)(b) exceeds the housing capacity inventoried under ORS 197.296(3)(a), then ORS 197.296(6) requires that the local government (a) "[a]mend its urban growth boundary to include sufficient buildable lands to accommodate housing needs for the next 20 years"; (b) amend its plan and implementing regulations to "include new measures that demonstrably increase the likelihood that residential development will occur at densities sufficient to accommodate housing needs for the next 20 years without expansion of the urban growth boundary"; or (c) adopt a combination of actions under (a) and (b).

## II.   HISTORY OF THE PROCEEDINGS

The city followed the dictates of ORS 197.296 in the periodic review process. In 2003, after three years of study and hearings, it adopted text and map amendments to the McMinnville Growth Management and Urbanization Plan (MGMUP), along with supporting findings, documentation of its future population and employment needs, a buildable land analysis, and an assessment of alternative lands for

expanding the UGB. The city was rapidly growing, having doubled in population between 1980 and 2002 to 28,200 persons. The city estimated it would grow to a population of 44,055 by 2023. Based on that expected growth, the city assessed its residential, industrial, and other land needs for the next 20 years.

The MGMUP set out a growth management strategy to minimize the extent, and guide the direction, of changes in the city's UGB to accommodate those future land needs. The plan directed zoning changes to facilitate more dense uses in the downtown area and along major roads, infill and redevelopment of underutilized land, and creation of "neighborhood activity centers" (NACs), in order to intensify land uses in the UGB expansion areas.

The plan described NACs as follows:

"Under this concept, neighborhoods are each centered or organized around an activity center that would provide a range of land uses within walking distance of neighborhoods—preferably within a one-quarter mile area—including neighborhood-scaled [commercial and civic uses]. Surrounding the activity center (or **focus area**) are **support areas**, which include the highest-density housing within the neighborhood, with housing densities progressively decreasing outward.

"These activity centers would be selected due to their location, distribution, proximity to vacant buildable lands, ability to accommodate higher intensity and density development, and their context and ability to foster the development of a traditional, or complete, neighborhood. The selected Neighborhood Activity Centers should be equally spaced around the edge of the McMinnville urban area, with the downtown area serving as the geographic center or hub."

(Boldface in original.) After further specifying those technical parameters for an NAC, which require a high degree of comprehensive master planning and a defined amount of land, the plan concludes that

"Neighborhood Activity Centers should not be located in areas that are heavily parcelized, or characterized by numerous individual ownerships. Priority should be given

> to locations that consist primarily of large vacant parcels in order to maximize the ability to realize such development in a cost effective, comprehensively planned manner."

The city determined that the NAC form of development would facilitate the construction of new medium-density to high-density housing, as compared with the low-density residential development pattern of the past, and decrease the quantity of land that needed to be added to the UGB by approximately 225 acres.

With those assumptions, the city determined that it needed to expand the UGB by 1,188 gross acres, including 890 buildable acres. The city concluded that this was necessary to accommodate a need for 537 acres for residential use (341 acres for low-density residential development and 106 acres for medium-density and high-density residential use), 193 acres for office and commercial uses, and 314 acres for parks in order to serve an estimated population of 44,055 by 2023.[2] The plan and its findings quantified needs for additional land supply, both inside and outside of the existing urban growth boundary, by land use type (*e.g.*, single-family detached housing, manufactured dwellings, row/townhouses, and apartments) and zoning designation.

The adopted UGB changes designated four parts of the added land for neighborhood activity centers (Three Mile Lane, Southwest, Northwest, and Grandhaven NACs). For the most part, those boundary changes captured prime agricultural land. Another area of agricultural land was added, a good part of which had already been developed as a city park (Norton Lane). The city also proposed to add four exception areas to the boundary to meet residential needs (Fox Ridge Road, Redmond Hill Road, Riverside South, and Lawson Lane). The city decided, however, not to add five exception areas (Westside Road, Bunn's Village, Old Sheridan Road, Riverside North, and Booth Bend Road) for various reasons.

The findings adopted to justify those actions evaluated a number of considerations in applying ORS 197.298(1) to nine alternative exception areas, including potential for annexation, costs of water service, transportation circulation

---

[2] The remaining acres were needed for institutional and governmental uses.

issues, consistency with a compact urban form (distance from commercial services and schools), compatibility with adjacent land uses, and environmental concerns. The findings analyzed whether the exception areas would be suitable for an NAC. Both the plan and the adopted findings concluded that the five excluded exception areas would be insufficient to meet that need:

> "These sub-areas are, in summary, extensively parcelized; held in multiple ownerships; require costly extension or upgrades to existing public utilities to support urban density development; are located some distance from existing public utilities, schools, and other services; in some cases, located adjacent to heavy industrial development and rail; and have extensive amounts of rural residential development in locations and patterns that make higher density development impracticable or [un]timely."

The findings further explained, "Absent supporting urban residential development, it is not appropriate that these sub-areas be considered for other identified residential land needs, such as schools, parks, and churches, or for commercial land needs." The plan assumed that future low-density residential land need could be satisfied by land within the existing UGB. The findings then evaluated the included exception areas and five parcels of high-quality agricultural land (Norton Lane, Three Mile Lane, Northwest, Grandhaven, and Southwest properties) for consistency with the Goal 14 locational factors.[3]

The city presented the MGMUP amendments and supporting documentation to the Department of Land Conservation and Development (DLCD or department) for approval as a completed work task.[4] Petitioners 1000 Friends of Oregon and Friends of Yamhill County objected to the

---

[3] Another agricultural area, West Hills South, was analyzed but not proposed to be added to the UGB at that time.

[4] Under the periodic review process, when a work task is completed, the actions are submitted to the DLCD director for approval. ORS 197.633(4). The director can approve or remand the work task, or refer the work task to LCDC. *Id.* If the director approves completion of the work task, the action is final unless an interested party files an objection to the approval. If a work task is referred or appealed, LCDC will consider the matter under a process set out by its rules. ORS 197.633(5). *See also* ORS 197.633(2) (required rulemaking for periodic review process); OAR ch 660, div 25 (periodic review rules).

city's submissions and appealed the director's decisions on those objections to LCDC. After a hearing, the commission approved inclusion of three exception areas in the UGB (Riverside South, Fox Ridge Road, and Redmond Hill Road), and remanded the proceeding to the city for an evaluation of adding lower-quality agricultural land, as well as, among other things, consideration of parkland needs and the exclusion of floodplain areas from the proposed UGB. On remand, the city adopted ordinances to remove floodplains from three expansion subareas, adjust slightly the calculations of needed lands, change the boundaries of the added areas, correct implementing zoning, justify its parklands assumptions, and otherwise respond to the remanding directives. In particular, the city added some lower-quality agricultural land (Fox Ridge North and West Hills South), and adopted new findings to justify its exclusion of other lower-quality agricultural lands.

Ultimately, the city determined that it needed to add 663 gross acres to the UGB for residential land needs to be developed at a higher density (6.3 dwellings/acre) than allowed under low-density residential zoning. It proposed to add four NAC areas to meet 488 acres of that need, two additional parcels of agricultural land to address 175 acres of that need (Norton Lane and West Hills South), and the three previously approved exception areas to be developed for residences at lower densities (Riverside South, Fox Ridge Road, and Redmond Hill Road).

And so, the city sought DLCD approval of the retooled UGB amendments. Petitioners filed extensive and particular objections to the submission with the DLCD director. In general, petitioners asserted that the city zoning map and regulations did not adequately implement the plan directives, the large size of the proposed UGB expansion was not justified, and the expansion improperly included prime agricultural land instead of available exception areas and areas of poorer soils. Petitioners argued that those actions were inconsistent with ORS 197.298, Goal 14, and the Goal 2 exception criteria. Petitioners objected to particular city findings that ruled out individual exception areas and lower-quality agricultural lands, complaining either that the findings lacked factual support or were insufficient to explain the particular decision under all applicable decisional standards.

The objections were not sustained by the DLCD director, who approved the UGB changes.

Petitioners appealed to LCDC. Petitioners took issue with DLCD's response to their objections. They complained that the DLCD report did not respond to their objections and that DLCD otherwise erred in sustaining factual findings and making legal determinations about the various parcels included and excluded from the proposed UGB change. Among the many specific assertions, petitioners argued that the NAC designations over-allocated needed amounts of commercial land and parkland, the boundary expansion excluded over 225 buildable acres of exception lands, and the relevant legal standard was "whether exception areas can accommodate the use at all, not whether they can do so as efficiently or beneficially as farmland." Specifically, petitioners alleged that "the city's identified land needs are not limited to pedestrian- and transit-oriented development in neighborhood activity centers" and added that,

> "[u]nder ORS 197.298, resource land cannot be included in a UGB instead of exception land if the exception land can reasonably accommodate some portion of identified needs. It cannot be excluded simply because it cannot meet one type of identified land need."

Petitioners reiterated that the exclusion of parcels with lower-quality agricultural lands could not be justified because of their inability to accommodate an NAC when "the city has [a] specific, identified land need for low density housing that exceeds the capacity of all the exception areas it has included within the UGB."

Following a hearing, the commission upheld the department's approval of the plan amendments. Petitioners sought review in this court. After petitioners filed their opening brief, LCDC withdrew its original order for reconsideration.

The order on reconsideration generally approved the exclusion of the exception areas because "they could not accommodate the identified land need (MGMUP, pp. 6-5 to 6-10)"[5] based on physical constraints, location relative to

---

[5] The referenced part of the MGMUP is a summary of the analysis of alternative sites for a UGB expansion. It describes the city's "identified land needs" as

existing and planned facilities, surrounding uses, market demand, and "[e]xisting development patterns and other factors affecting urbanization." LCDC more particularly justified the failure to include particular exception areas because the area could not (1) be served with public facilities under ORS 197.298(3)(b); (2) "reasonably accommodate the need for pedestrian- and transit-oriented development in a neighborhood activity center"; (3) "accommodate residential use"; or (4) "reasonably accommodate the need for a compact, pedestrian-friendly urban area." As to the omitted lower-quality resource land, West Hills was excluded because it could not "reasonably accommodate the city's identified need [for 'medium- or high-density housing']" and because of topographic constraints to the supply of water under ORS 197.298(3)(b). The resource area north of Fox Hills Road was left out because, "pursuant to Goal 2, the city did not need to consider lands under ORS 197.298 that could not reasonably accommodate its identified need." The resource land near the airport was determined to not "accommodate an identified need due to safety issues." Based on these and other extensive findings, LCDC concluded that "the city has adequately justified those areas included and excluded from the UGB based on relevant criteria." The LCDC order is before us on review.

## III. CONTENTIONS OF THE PARTIES

Petitioners raise three assignments of error. We reject the second and third assignments of error without further discussion. The remaining assignment of error raises a number of general concerns about whether the city properly applied Goal 14 and ORS 197.298 to sort through potentially eligible property for inclusion in the UGB. Those concerns are that the city initially erred in amending the UGB and LCDC erred in upholding the UGB decisions because (1) the

---

needs for "an increased percentage of multi-family, or single-family attached, housing," in general, and neighborhood activity centers, in particular, and for "314 acres of public parkland, 96 acres for public school use, and 106 acres for future commercial development." The summary further notes the "identified residential land needs as they are described in the 'McMinnville Residential Land Needs Analysis' (and the revisions to that document), and the 'Urbanization Element Update.'" The residential land needs analysis describes generic residential land needs.

city did not apply the Goal 14 standards completely or consistently when it assessed exception areas by, on the one hand, using a particular factor to rule out some land with a disqualifying characteristic, but, on the other hand, including land in the boundary with that same quality; and (2) the city ruled out some land for consideration by defining its land needs too particularly at the front end of the ORS 197.298 prioritization—*i.e.*, land needed for use as an NAC or for particularized residential land needs—so that less exception land was available for the city's particular needs and more agricultural land was included in the boundary than otherwise would have been included had the city's needs been defined more generically.

As to the latter contention, respondents argue that ORS 197.296(3)(b) requires the city to determine "housing need by type and density range, in accordance with ORS 197.303 and statewide planning goals and rules relating to housing." To the extent that need cannot be met by zoning changes inside the UGB, then land can be added to the UGB under ORS 197.298 to address those particular housing needs. Respondents claim that that is what the city did.

LCDC defends its decision more specifically. The commission contends that Goal 14, in general, and its incorporated Goal 2 exception factors can be used to define even more particular land needs at the front end of the ORS 197.298 analysis. Thus, LCDC asserts that the city defined the NAC land form as the need to be evaluated under the priorities statute and relied on the desired characteristics of an NAC site as reasons to rule out higher-priority land in order to resort to lower-priority land under ORS 197.298. Petitioners disagree and counter that, even if an NAC does qualify as a generic or specific land need under ORS 197.298, the land added through the NACs does not satisfy all of the city's quantitative needs for additional residential land and a more rigorous application of ORS 197.298 is required to justify bringing agricultural land into the boundary for that non-NAC need.

Petitioners also dispute the sufficiency of LCDC's findings on their objections to the city's rationale for not including particular exception areas in the UGB (Old

Sheridan Road, Riverside North, and Booth End Road) or not adding lower-quality agricultural land (West Hills, north of Fox Ridge Road, north of McMinnville Airport, and various smaller tracts) before including prime agricultural land. The city and LCDC respond that the locational factors in Goal 14 were properly applied to categorize those exception and lower-value agricultural lands as insufficient.

Many of the general differences between the parties stem from their different understandings about how ORS 197.298 works to sort land available for inclusion within a UGB. In petitioners' view, the priorities statute works to categorize land as available to meet broadly defined land use needs (in this case, for residential land of any kind). Higher-priority land qualifies to meet that need unless urban services cannot be provided to the land because of physical constraints. Goal 14 is then applied to the prioritized and available land to determine the specific urban growth areas.

According to respondents, however, ORS 197.298 is applied—especially during the periodic review process—to determine the adequacy of land for more particular land use needs (in this case, for higher-density residential uses). Higher-priority land qualifies to meet that need unless it is determined to be unsuitable under the Goal 14 locational factors and the Goal 2 exceptions criteria. Goal 14 is then applied to corroborate the inclusion of higher-priority land and to justify any further selection among land of a lower-priority class.

We ultimately conclude that neither party has it quite right. For the reasons stated below, we agree that ORS 197.298 does provide the first cut in the sorting process and that Goal 14 is then applied to justify the inclusion or exclusion of the sorted lands and any remaining choices about what land to include in the boundary. Goal 14 also plays a role in identifying the types of land that are subjected to the priorities statute. Goal 14 is used in evaluating the adequacy of available land under ORS 197.298(1), but in a more particular way than suggested by respondents. We reach those initial conclusions based on an analysis of the text and context of ORS 197.298.

## IV.   STATUTORY CONSTRUCTION ANALYSIS

Our determination of the legislature's intent in enacting ORS 197.298 is guided primarily by the text and context of the statute, in light of any pertinent legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). In the analysis of the text of the statute, we give words of common usage their "plain, natural, and ordinary meaning." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). That textual analysis, of course, is assisted by our prior construction of the statutory terms. *Waite v. Dempsey*, 203 Or App 136, 141, 125 P3d 788 (2005). The context of a statute includes the entire enactment of which it was a part, *State v. Ortiz*, 202 Or App 695, 699-700, 124 P3d 611 (2005), as well as related statutes on the same subject, *State v. Carr*, 319 Or 408, 411-12, 877 P2d 1192 (1994).

A.   *Step One: Determine the land needed under ORS 197.298(1)*

The first issue concerns how to categorize land needs that arise from periodic review for purposes of the application of ORS 197.298 to a large-scale expansion of a UGB. LCDC and the city argue that ORS 197.298 can be applied to prioritize areas of potential UGB expansion based upon the functional needs of particularly intended land uses (*i.e.*, an NAC). Petitioners, by contrast, suggest that the statute is applied to broad, generic types of land use needs that are identified during periodic review (*e.g.*, 250 acres for residential uses) and that adequacy determinations under ORS 197.298(1) are less particular in focus.

Again, the descending priorities in ORS 197.298(1) are applied to determine whether the priority land is "inadequate to accommodate the amount of land needed." The first step is to determine the "amount of land needed." That determination is necessarily made by the application of Goal 14, which provides that "[e]stablishment and change of the boundaries shall be based upon considerations of the following factors: (1) Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals; (2) Need for housing, employment opportunities, and livability * * *." In *Residents of Rosemont v. Metro*, 173 Or App 321, 328, 21 P3d 1108 (2001), we explained that

"[w]e held in *Baker* [*v. Marion County*, 120 Or App 50, 852 P2d 254, *rev den*, 317 Or 485 (1993),] that factors 1 and 2 of Goal 14 are interdependent and that, if one of the factors is not fully satisfied, or is less determinative, that factor must still be considered and discussed in deciding if a need for expansion of a UGB has been shown under factors 1 and 2 of Goal 14."

(Footnote omitted.) In the context of periodic review, Factor 1 pertains to a determination of overall land need in order to accommodate population growth. Factor 2 requires subcategorization of that need at least to specify separate quantities of land needed for "housing, employment opportunities, and livability." Because different types of land use consume different amounts of land (*e.g.*, the dwellings/acre densities for low-, medium-, and high-density residential development), determining the amount of land needed to be added to a UGB during periodic review under Factors 1 and 2 necessarily requires differentiation of land use types according to their land consumption attributes. The coordinated application of ORS 197.298 with Goal 14 ("[i]n addition to any requirements established by rule addressing urbanization") implies that ORS 197.298 is applied during periodic review to the quantified land use needs identified by the operation of Factors 1 and 2 of Goal 14.

That application of ORS 197.298 is more directly required by ORS 197.296 during the periodic review process. That statute prompts a quantification of the amounts of land needed for specific residential purposes prior to UGB amendments that result from the periodic review process.[6] As part of that process, ORS 197.296(3) requires an analysis of "housing need by type and density range * * * to determine the number of units and amount of land needed for each needed housing type for the next 20 years." If those needs cannot be met within the existing UGB through rezonings or infill, then the locality must "[a]mend its urban growth boundary to

---

[6] The 1995 Legislative Assembly adopted the initial versions of ORS 197.296 and ORS 197.298 as part of one law. Or Laws 1995, ch 547. In construing the meaning of a statute, we have looked at the context of related statutes in the same chapter in which a provision has been codified, *Morsman v. City of Madras*, 203 Or App 546, 561, 126 P3d 6, *rev den*, 340 Or 483 (2006), and at other provisions of the bill enacting that statute, *Ortiz*, 202 Or App at 699-700.

include sufficient buildable lands to accommodate housing needs." ORS 197.296(6)(a). The statutory direction to amend the UGB "to accommodate housing needs" that are classified "by type and density" strongly implies that the next step— the operation of ORS 197.298—works on those same inventoried needs. Thus, for purposes of periodic review, ORS 197.298 works on types of land uses that generate the need for specific quantities of land as a result of the application of the need factors of Goal 14 and related statutory directives, including ORS 197.296.[7] We reject petitioners' general contention that LCDC erred in applying ORS 197.298(1) to evaluate the city's need for higher-density residential land, as opposed to all residential needs.[8]

B. *Step Two: Determine the adequacy of candidate lands under ORS197.298(1) and (3)*

1. *General scheme characteristics—the tension between ORS 197.298 and Goal 14*

The next step is somewhat more complicated—the application of ORS 197.298(1) and (3), together with Goal 14, to locate and justify the inclusion of land to fill that quantified need. ORS 197.298(1) provides that its prioritization

---

[7] LCDC did not approve any addition to the McMinnville UGB because "[s]pecific types of identified land needs cannot be accommodated on higher priority lands" under ORS 197.298(3)(a). We need not apply that part of the statute to dispose of the contentions in this review proceeding. ORS 197.298(3)(a) does have contextual relevance, however, in contrasting the types of "[s]pecific * * * land needs" under ORS 197.298(3) with the types of land use needs identified at the front end of ORS 197.298 as the statute is applied during the periodic review process. The text of ORS 197.298(3) suggests that its "specific types" pertain to need for land of a particular quality or situation, such as size, site characteristics, service levels, or proximity to other land uses, that occurs only on lower-priority land. For example, ORS 197.712(2)(c) requires comprehensive plans to "provide for at least an adequate supply of sites of suitable sizes, types, locations and service levels for industrial and commercial uses consistent with plan policies." That more discrete land need is in contrast to the more generic land use needs identified during periodic review and used in making adequacy determinations under ORS 197.298(1).

[8] We need not decide the relationship of the current Goal 14 to ORS 197.298. The land need portion of Goal 14 now requires that a UGB change be based on

"(2) Demonstrated need for housing, employment opportunities, livability or uses such as public facilities, streets and roads, schools, parks or open space, or any combination of the need categories in this subsection (2).

"In determining need, local government may specify characteristics, such as parcel size, topography or proximity, necessary for land to be suitable for an identified need."

scheme, which allows for bringing prime resource land into the UGB as a last resort, is "[i]n addition to any requirements established by rule addressing urbanization"—a plain reference to Goal 14 (Urbanization) and its implementing rules. As noted above, Goal 14 sets out seven factors for changing a UGB: two "need" factors relate to determining the need for additional land ("[d]emonstrated need to accommodate long-range population growth" and "[n]eed for housing, employment opportunities, and livability") and five "locational" factors relate to justifying the selection of land to satisfy those determined needs (either inside the existing UGB or at specific locations outside the UGB) based on public facilities and services, efficiency of land uses, consequences of any allowed development, retention of agricultural land for farm use, and compatibility of development with nearby agricultural activities.[9]

In prior decisions concerning the application of Goal 14 to UGB changes, we have required that all five locational factors be considered together and balanced in assessing the alternative locations for a UGB change. In *Citizens Against Irresponsible Growth v. Metro*, 179 Or App 12, 17, 38 P3d 956 (2002), we concluded that the locational factors in Goal 14 "do not stand alone but represent * * * several factors to be considered and balanced when amending a UGB. * * * No single factor is of such importance as to be determinative in a[ ] UGB amendment proceeding, nor are the individual factors necessarily thresholds that must be met." Similarly, in *1000 Friends of Oregon v. Metro*, 174 Or App 406, 409-10, 26 P3d 151 (2001), we noted that

"the locational factors are not independent approval criteria. It is not necessary that a designated level of satisfaction of the objectives of each of the factors must always be met before a local government can justify a change in a UGB. Rather, the local government must show that the factors were 'considered' and balanced by the local government in

---

[9] The incorporated Goal 2 exception standards also require an analogous assessment of the reasons for a UGB change (comparable to Goal 14, Factors 1 and 2); why areas that do not require an exception to Goal 14 (*i.e.*, areas already inside the UGB) "cannot reasonably accommodate the use"; the long-term environmental, economic, social, and energy consequences of expanding at a particular location, as opposed to other possible locations; and the compatibility of development allowed by the expansion with adjacent uses.

determining if a change in the UGB for a particular area is justified. It is within a local government's authority to evaluate the Goal 14 factors and exercise its judgment as to which areas should be made available for growth."

In other words, under Goal 14, an expansion of a UGB to include agricultural land could be justified if considerations of the cost of public facilities, land use efficiency, and environmental, energy, economic, and social consequences and compatibility with nearby land were favorable.

By contrast, ORS 197.298 appears to operate less flexibly. Under the priorities statute, prime agricultural land can be included within a UGB *only if* urban reserve land, nonresource land, exception land, and marginal land are "inadequate to accommodate the amount of land needed" for identified urban uses.

So, which scheme ultimately controls the choice of where to expand a UGB—the flexible Goal 14 or the more rigid ORS 197.298? Our case law—in a very imprecise way— suggests that the answer may be either or both.

We have previously determined that Goal 14 interacts with ORS 197.298 in two ways. First, the two operate *independently* to justify a UGB expansion. Compliance with ORS 197.298 does not absolve the independent and separate requirement to apply the Goal 14 factors to a proposed UGB change. In *Residents of Rosemont*, two cities challenged Metro's decision to expand the Portland-area UGB in order to address a need for housing in a particular part of the metropolitan area. An issue on review was whether a subregional need for housing could qualify under the Goal 14 need factors as a basis for expanding the UGB without considering that need in the context of the overall regional need for housing. We held that it could not, at least in the context presented. We also concluded that compliance with the criteria in ORS 197.298 did not excuse the separate application of Goal 14 to the UGB amendment:

"Those priority concerns [in ORS 197.298] do not purport to be the exclusive considerations governing the location of UGBs, and ORS 197.298(3) does not purport to excuse compliance with Goal 14's requirements for the establishment or change of UGBs. ORS 197.298 specifically provides that

the priorities for UGB inclusion that it sets forth are '[i]n addition to any requirements established by rule address-ing urbanization.' Metro contends that it is impossible to implement the requirements of ORS 197.296 and 197.298 *and* the requirements of Goal 14. Because of that, it asserts that the provisions must be read together. The problem with that argument, however, is that, because ORS 197.298 specifically provides that its requirements are *in addition* to the urbanization requirements of Goal 14, which are par-ticularly directed to the establishment and change of UGBs, it cannot be said that the statute was intended to supersede Goal 14."

173 Or App at 332-33 (emphases in original). *See also 1000 Friends of Oregon*, 174 Or App at 412-14 (compliance with ORS 197.298 in justifying a UGB change does not excuse the need to separately apply Goal 14, Factor 6 (retention of agri-cultural land), to the proposed change).

Subsequently, though, we have held that ORS 197.298 is to be applied in an *integrated* way with Goal 14. In *City of West Linn v. LCDC*, 201 Or App 419, 422, 119 P3d 285 (2005), we reviewed an LCDC approval of another amend-ment to the Portland-area UGB by Metro. In that case, the petitioner argued that the particular UGB expansion was inconsistent with ORS 197.298 because lower-priority resource land had been added without determining that there was inadequate land of higher priority anywhere in the region. We agreed with LCDC that the locational factors of Goal 14 were relevant in determining whether land of a par-ticular priority in ORS 197.298(1) is "inadequate to accom-modate the amount of land needed." We reasoned that

"[t]he operative term is 'inadequate.' Whether there is ade-quate land to serve a need may depend upon a variety of factors. In particular, the adequacy of land may be affected by locational characteristics that must be taken into account under Goal 14. As LCDC correctly noted, ORS 197.298(1) expressly provides that the priorities that it describes apply '[i]n addition to any requirements estab-lished by rule addressing urbanization,' such as the loca-tional factors described in Goal 14. As a result, the fact that other, higher priority land may exist *somewhere* adjacent to the UGB does not necessarily mean that that land will be '[ ]adequate to accommodate the amount of land needed,' if

using it for an identified need would violate the locational considerations required by Goal 14. In other words, the statutory reference to 'inadequate' land addresses suitability, not just quantity, of higher priority land."

*City of West Linn*, 201 Or App at 440 (emphasis in original). In *Hildenbrand v. City of Adair Village*, 217 Or App 623, 634, 177 P3d 40 (2008), we summarized the holding in *City of West Linn* and stated that determining "whether there is 'inadequate' land to serve a need depends on not only the constraints identified by ORS 197.298(3), but also the criteria for locating an urban growth boundary expansion under Goal 14."

This relationship between the overlapping policies in Goal 14 and ORS 197.298—that the policies are to be applied separately as well as together—creates, at the very least, some awkwardness in their application. Complete integration of the policies is inconsistent with their independent viability. What might reconcile that tension, however, is if ORS 197.298 is not completely conflated with Goal 14—only partially integrated with the goal—in its application, and if Goal 14 is separately and fully applied to the candidate land identified under ORS 197.298 in order to determine if that land is suitable for inclusion in the UGB. We examine that possibility next.

### 2. *Integration of Goal 14 and ORS 197.298*

We turn, then, to the adequacy assessment under ORS 197.298(1), specifically the factors used to determine when priority "land * * * is inadequate to accommodate the amount of land needed." Petitioners contend that a jurisdiction can use lower-priority land for its land needs only when higher-priority land is not available to accommodate the need because of one of the limitations in ORS 197.298(3) (specific type of identified need, urban services unavailability due to topographical or physical constraints, needed to provide services to higher-priority land). The Goal 14 locational factors, according to petitioners, must be applied in the process of selecting among alternative locations in the same priority class. Respondents disagree and argue that all of the Goal 14 locational factors are used to determine if priority land is

"inadequate to accommodate the amount of land needed" under ORS 197.298.

The parties agree, and we concur, that any necessary UGB amendment process for purposes of land development begins with the identification of buildable land that is contiguous to the existing boundary. ORS 197.296(6)(a) makes this step explicit for housing needs, requiring the locality to "[a]mend its urban growth boundary to include sufficient buildable lands to accommodate housing needs." For this and other purposes, ORS 197.295(1) defines "buildable lands" as "lands in urban and urbanizable areas that are suitable, available and necessary for residential uses * * * [including] both vacant land and developed land likely to be redeveloped." LCDC has further defined "suitable and available" buildable lands to exclude land that is severely constrained by natural hazards under Goal 7; subject to natural resource protection measures under Goals 5, 15, 16, 17, or 18; severely sloped; within a floodplain; or to which public facilities "[c]annot be provided." OAR 660-008-0005(2).

The adequacy assessment under ORS 197.298(1), then, applies to land that could be developed. The candidate land, whether exception land or different types of agricultural land, must be "buildable." So, evaluating whether candidate land is "inadequate" under ORS 197.298(1) requires considering qualities other than whether the land is buildable.

*City of West Linn* established that Goal 14 is applied in the prioritization of land under ORS 197.298(1) to determine if land of a particular priority "is inadequate to accommodate the amount of land needed." 201 Or App at 440. However, petitioners read *City of West Linn* too narrowly in confining the Goal 14 analysis in ORS 197.298(1) to the selection of land within a single priority class of lands, rather than as general criteria on the inadequacy of land within that priority class to meet the need and allow resort to lower-priority land.

Rather, the question becomes whether all of the Goal 14 locational factors are used to disqualify higher-priority land under ORS 197.298(1), or whether a more limited sorting occurs that leaves land available for the potential application of ORS 197.298(3). Based on the text of both policies—

including a comparison of the more specific locational criteria in ORS 197.298(3) with their Goal 14 analogues, and the textual dynamic within ORS 197.298 between subsections (1) and (3)—we conclude that the legislature likely intended the latter option.

In the context of expanding a UGB to include lower-priority land, ORS 197.298(3) states more specific limitations than the analogous factors in Goal 14 do: Factor 3 of Goal 14 requires consideration of the "[o]rderly and economic provision for public facilities and services," but ORS 197.298(3)(b) prefers higher-priority land over resource land unless "[f]uture urban services could not reasonably be provided to the higher priority lands due to topographical or other physical constraints." Goal 14, Factor 4, directs consideration of the "[m]aximum efficiency of land uses within and on the fringe of the existing urban area," whereas ORS 197.298(3)(c) inhibits urbanization of lower-priority land unless "[m]aximum efficiency of land uses within a proposed urban growth boundary requires inclusion of lower priority lands in order to include or to provide services to higher priority lands."

The particular limitations in ORS 197.298(3)(b) and (c) have no practical effect if the broader and less restrictive Goal 14 factor counterparts must be used to determine whether to include lower-priority land under ORS 197.298(1). If land is "inadequate" under Factor 3 because the relative cost of delivery of public facilities and services to the area is high, then the more specific limitation in ORS 197.298(3)(b)—permitting an inadequacy conclusion only when public services cannot be extended because of topographic or physical constraints—has no independent force. Because ORS 197.298(3) relates "only to the inclusion of land that comes within the priority concerns described in [ORS 197.298(1)]," *Residents of Rosemont*, 173 Or App at 332, it follows that ORS 197.298(1) must use different kinds of limitations to determine inadequacy than those set out in ORS 197.298(3). Otherwise, ORS 197.298(3) is redundant or incapable of application. We are constrained to construe ORS 197.298 in a way that gives effect to all of its terms. "As a general rule, we assume that the legislature did not intend any portions of its enactments to be meaningless surplusage." *State v. Stamper*, 197 Or App 413, 417, 106 P3d 172, *rev den*, 339 Or 230 (2005); *see also* ORS 174.010 ("In the construction

of a statute, * * * where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all.").

It follows, then, that the more specific limitations in ORS 197.298(3) displace the application of their more generic and flexible Goal 14 counterparts in the application of ORS 197.298(1). That displacement gives meaning to ORS 197.298(3), which reads that it—as opposed to other factors—is applied to determine "if land of higher priority is * * * inadequate to accommodate the amount of land estimated in subsection (1)." That explicit requirement precludes the application of any analogous, but less restrictive, suitability criteria under ORS 197.298(1) to make that same determination, *i.e.*, whether higher-priority land "is inadequate to accommodate the amount of land needed." That limited use of Goal 14 in applying ORS 197.298(1) avoids the complete conflation of Goal 14 and ORS 197.298 and allows for the sequential application of ORS 197.298(3).

Instead, the Goal 14 locational factors that are applied under ORS 197.298(1) and *City of West Linn* are those that are *not* the counterparts to the ORS 197.298(3) factors: Factor 5 ("Environmental, energy, economic and social consequences") and Factor 7 ("Compatibility of the proposed urban uses with nearby agricultural activities"). The application of Goal 14, Factors 5 and 7, at this point parallels the separate considerations for determining the location of a UGB amendment that are required by the Goal 2 exception criteria that are incorporated into Goal 14; that parallel reinforces the logic of a limited use of Goal 14 as part of the application of ORS 197.298. Those Goal 2 considerations are:

> "(3) The long term environmental, economic, social and energy consequences resulting from the use of the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located in areas requiring a goal exception other than the proposed site; and

> "(4) The proposed uses are compatible with other adjacent uses or will be so rendered through measures designed to reduce adverse impacts."

OAR 660-015-0000(2), Part II.[10] Thus, those specific Goal 2 exception criteria and their Goal 14 factor counterparts (Factors 5 and 7) are the relevant Goal 14 considerations in assessing the adequacy of land in a priority class under ORS 197.298(1).

Based upon the text and context of ORS 197.298, we conclude that not all of the Goal 14 locational criteria are applied under ORS 197.298(1) to determine if priority land "is inadequate to accommodate the amount of land needed." Instead, only the consequences and compatibility factors of Goal 2, Part II, and Goal 14 are applied. Whether the priority land is inadequate due to the unavailability of public facilities and services or because of land use efficiencies is determined by the separate application of ORS 197.298(3). Thus, we agree with petitioners' general claim that LCDC improperly applied ORS 197.298(1) in approving the city's resort to lower-priority land because of the relatively higher costs of providing a particular public facility or service to the higher-priority area.

C.  *Step Three:  Determine which candidate lands should be included under Goal 14*

Goal 14 is independently applied, then, *after* land has been prioritized under ORS 197.298 as adequate to accommodate the identified need. ORS 197.298 operates, in short, to identify land that *could* be added to the UGB to accommodate a needed type of land use. Thereafter, Goal 14 works to qualify land that, having been identified already under ORS 197.298, *should* be added to the boundary. This works in two ways—both to make choices among land in the lowest rung of the priority scheme and to justify the inclusion of the entire set of lands selected under ORS 197.298. Once candidate lands have been located under ORS 197.298 (*i.e.*,

---

[10] The remaining exception criteria are less relevant in determining where a UGB should be expanded. The first criterion goes to the reasons for expanding the UGB and is satisfied through the general application of Goal 14, particularly Factors 1 and 2. OAR 660-004-0010(1)(d)(B)(i) (reasons factor for UGB change under former Goal 14 "satisfied by compliance with the seven factors of Goal 14"). The second criterion requires consideration of "[a]reas which do not require a new exception." In the case of a Goal 14 exception, that area is the land already in the UGB. *See* 244 Or App at 271-72.

the higher-priority lands that have been identified as adequate to satisfy part of a land need and any remaining lower-priority lands that exist in quantities sufficient to accommodate the remaining need), the location of the boundary changes is determined by the full and consistent application of the Goal 14 locational factors, the Goal 2 exception criteria to those candidate lands, and relevant plan and ordinance criteria.

It is at this point in the analysis that cost efficiencies in the provision of public facilities and services become relevant. Considerations of Goal 14, Factor 3 (provision of public facilities and services) and Factor 4 (efficiency of land uses), at this point—in combination with the other Goal 14 locational factors—may prompt the discarding of candidate land identified under ORS 197.298, and the selection of land otherwise consistent with the Goal 14 factors.

That application of all of the provisions in Goal 14 to the resulting UGB change is required under *Citizens Against Irresponsible Growth* and *1000 Friends of Oregon*. The application of Goal 14 to the land that results from the prioritization of ORS 197.298 allows the separate and full use of both policies in justifying a UGB change that is contemplated by the priorities statute ("[i]n addition to any requirements established by rule addressing urbanization, land may not be included within an urban growth boundary except under the following priorities") and our holdings in *Residents of Rosemont* and *1000 Friends of Oregon*.

With those principles in mind, we turn to petitioners' remaining contentions.

## V.  JUSTIFICATION FOR THE PROPOSED CHANGES

A.  *Standards of review*

We begin with our standards of review. ORS 197.650(1) provides that we review the LCDC order "in the manner provided in ORS 183.482." That part of the Administrative Procedures Act sets out the standards of review of a contested case order and provides:

"(a)  The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously

interpreted a provision of law and that a correct interpretation compels a particular action, the court shall:

"(A)   Set aside or modify the order; or

"(B)   Remand the case to the agency for further action under a correct interpretation of the provision of law.

"(b)   The court shall remand the order to the agency if the court finds the agency's exercise of discretion to be:

"(A)   Outside the range of discretion delegated to the agency by law;

"(B)   Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C)   Otherwise in violation of a constitutional or statutory provision.

"(c)   The court shall set aside or remand the order if the court finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

ORS 183.482(8).

We recently explained that the requirements that an agency correctly interpret the law, explain inconsistencies, and have evidentiary support for the decision implies that LCDC must " 'demonstrate in [its] opinion[ ] the *reasoning* that leads the agency from the *facts* that it has found to the *conclusions* that it draws from those facts.' " *1000 Friends of Oregon v. LCDC*, 237 Or App 213, 225, 239 P3d 272 (2010) (*Woodburn*) (quoting *Drew v. PSRB*, 322 Or 491, 500, 909 P2d 1211 (1996)) (emphasis in *Drew*). *See also City of Roseburg v. Roseburg City Firefighters*, 292 Or 266, 271, 639 P2d 90 (1981) (stating the test as "whether there is a basis in reason connecting the inference [of compliance with the decisional standard] to the facts from which it is derived"). In connection with substantial evidence review, we do not review the city's decision for evidentiary support. Rather, "[o]ur role is to determine whether [LCDC] applied the correct legal test

in deciding whether [the city's] decision is supported by substantial evidence." *Citizens Against Irresponsible Growth*, 179 Or App at 21.[11]

Finally, the focus of our review is on the issues presented on appeal that have been preserved before LCDC. As we said in *Marion County v. Federation For Sound Planning*, 64 Or App 226, 237, 668 P2d 406 (1983), "[a] petitioner seeking judicial review under the terms of [ORS 197.650] must base the arguments on the objections (or comments) filed with DLCD; those objections will therefore frame the issues on appeal."[12] This requires objectors before LCDC to make an explicit and particular specification of error by the local government. ORAP 5.45(1) requires preservation of error in a lower court in order to consider the error on appeal. We apply that preservation requirement to administrative proceedings. *Veselik v. SAIF*, 177 Or App 280, 288, 33 P3d 1007 (2001), *rev den*, 344 Or 121 (2002); *see also VanSpeybroeck v. Tillamook County*, 221 Or App 677, 690, 191 P3d 712 (2008) (applying preservation requirements in proceedings to review LUBA orders). A party's claim of error by LCDC

---

[11] In *City of West Linn*, we concluded, based on *1000 Friends of Oregon v. LCDC (Lane County)*, 305 Or 384, 404-05, 752 P2d 271 (1988), that an LCDC order approving a legislative UGB change under ORS 197.650 "implicates the substantial evidence standard that is described in [ORS 183.482]." 201 Or App at 428. More precisely, LCDC reviews UGB and periodic review submissions for "compliance with the statewide planning goals." ORS 197.628(1). Goal 2, in turn, requires that land use decisions have an "adequate factual base." LCDC's review of a legislative UGB change for an "adequate factual base" is synonymous with the requirement that a decision be supported by substantial evidence. Substantial evidence review of an LCDC periodic review order may directly occur when the commission requests and obtains new evidence for the periodic review submission and then makes factual findings on that enhanced record. *See* OAR 660-025-0160(5) (allowing supplement to periodic review record).

[12] Moreover, under ORS 197.633(2), LCDC is obliged to "adopt rules for conducting periodic review." The rules require persons who object to a work task submittal to file written objections with DLCD that "[c]learly identify an alleged deficiency in the work task sufficiently to identify the relevant section of the final decision and the statute, goal, or administrative rule the task submittal is alleged to have violated." OAR 660-025-0140(2)(b). OAR 660-025-0150(4)(d)(B) imposes that same specification of error requirement when an appeal is taken to LCDC from DLCD decisions on periodic review task completions. Objections that do not meet that standard "will not be considered by the director or commission." OAR 660-025-0140(3). If no objections are received, "the work task shall be deemed approved." OAR 660-025-0150(3)(a). Standing to appeal an LCDC periodic review order is limited to "[p]ersons who submitted comments or objections" to the agency. ORS 197.650.

in its periodic review order, therefore, is limited to the commission's resolution of objections raised in the periodic review proceedings.

## B. *The commission's defense*

We turn—at long last—to petitioners' contentions about the deficiencies in LCDC's order and findings in light of the specific objections and exceptions they filed with the agency. Petitioners' assignment of error contends that (1) LCDC erroneously interpreted ORS 197.298, Goal 14, *former* ORS 197.732(1)(c)(B) (2005), *amended by* Or Laws 2007, ch 71, § 68, *renumbered as* ORS 197.732(2)(c)(B) (2007) ("[a]reas which do not require a new exception cannot reasonably accommodate the use"), and Goal 2, Part II(c), OAR 660-004-0020 (an administrative rule detailing the requirements for a "reasons" exception to a goal); (2) LCDC made a decision not supported by substantial evidence; and (3) LCDC acted inconsistently with an official agency position in adding agricultural land rather than other lands. Although petitioners' contentions are framed with respect to the exclusion of particular exception and higher-priority resource lands from the area of the proposed UGB change, their arguments attack the *manner* in which the city and LCDC applied ORS 197.298. Petitioners complain that the city defined the needed land—higher-density residential land—too specifically under Step One so that ORS 197.298(1) was applied to allow the exclusion of some land that could be used for low-density residential needs and that lands were excluded under Step Two because of a single deficiency rather than an overall adequacy assessment based on balancing all of the considerations. Moreover, petitioners argue that various locational factors in Goal 14 were not considered as part of Step Three in evaluating the alternatives for the UGB expansion.

In its brief, LCDC offers a broad justification for its order and joins the city's more specific defenses. LCDC explains that the city identified neighborhood activity centers as a form of land need to which the prioritization scheme of ORS 197.298(1) was then applied, and that the commission was correct in approving the exclusion of exception areas and higher-priority resource lands that could not accommodate

NACs. LCDC further argues that, under the Goal 2 exceptions criteria, a broad test should be employed under ORS 197.298 to determine whether candidate lands are "inadequate to accommodate the amount of land needed." LCDC reasons that (1) ORS 197.298 is administered "[i]n addition to" Goal 14; (2) Goal 14 includes the "reasons" exception criteria in Goal 2; (3) ORS 197.298(1) incorporates the exceptions criterion in Goal 2 that "[a]reas that do not require a new exception cannot reasonably accommodate the use"; and, therefore, (4) the statute allows a broad assessment of whether land is "inadequate to [reasonably] accommodate" an identified land need.

LCDC's first defense—that the city appropriately identified a quantity of needed NAC land and applied ORS 197.298(1) to that quantified need—fails because that is not what the city did. The city did determine that the NAC mixed-use category of land use would use less land than the traditional low-density residential development for housing needs. But the city did not quantify the amount of any needed mixed-use category of commercial and residential land uses and then apply the ORS 197.298(1) priorities to that quantified mixed-use need. To recall, ORS 197.298(1) is applied to determine if land of a particular priority "is found to be inadequate to accommodate the *amount of land*" determined to be needed. (Emphasis added.) Here, the city quantified the need for categories of residential, commercial, industrial, parkland, and other land uses and then applied the priorities to those quantitative needs. However, the city used the defined qualities of an NAC (*e.g.*, size, location to downtown, and urban form) as a basis to rule out higher-priority land under ORS 197.298(1), and, in doing so, proved the wrong point.

LCDC's argument that its order is justified because of the need for land for NACs is not supported by the order's reasoning or result. First, the order is unclear on the specifics of the identified need under ORS 197.298—whether the need is for residential land in general; higher-density residential land; mixed-use land for specified residential, commercial, and parkland needs; or NACs. The order upholds the exclusion of the Westside Road exception area from the UGB amendment under ORS 197.298(3)(b) (unavailability of services due to topographic or other physical constraints), rather than because the area is unsuitable for use as an NAC.

Another part of the order approves exclusion of the Bunn's Village exception area under ORS 197.298(3)(b) as well as under ORS 197.298(1) for its unsuitability for "pedestrian- and transit-oriented development in a neighborhood activity center." LCDC determined that the Booth Bend Road exception area "cannot reasonably accommodate the identified need," but purports to identify the need as one for a "compact, pedestrian-friendly urban area." The city's failure to include the Old Sheridan Road exception area into the boundary change was approved because "this area cannot reasonably accommodate the identified need," yet that approval was made without any elaboration on the nature of that identified need. The Riverside North area was not included because "this area cannot reasonably accommodate residential use." If ORS 197.298 is applied to address separate types of land needs, then the amount of each of those land needs must be quantified, and the land supply examined to see if it is "inadequate to accommodate [each] amount of land needed."

Second, the order, in fact, approves the inclusion of some of the lower-priority agricultural land (Norton Lane, West Hills South, and part of Fox Ridge North) ahead of some exception areas even though those agricultural areas were not designated as NACs. Thus, the adopted justification for the UGB amendments as well as the actual inclusion of agricultural land for general residential use suggests that lower-priority land was not added solely to meet the need for an identified quantity of land for mixed-use development. The adopted order fails to explain why the failure of an exception area to accommodate the need for an NAC justifies its exclusion from the expansion area when lower-priority land is being added to accommodate a less specific need for residential land. As we held in *Woodburn*, 237 Or App at 224-26, when an LCDC order fails to explain its reasoning for finding consistency with the standards for a UGB expansion, the order lacks substantial reason and becomes inadequate for judicial review. The failure of LCDC to consistently identify the needed categories and quantities of land uses—the fundamental premises of its justification of the UGB change under ORS 197.298—requires the same conclusion here.

LCDC's second point—that the "[a]reas that do not require a new exception cannot reasonably accommodate the use" criterion in the Goal 2 exception standards can be used

to rule out higher-priority land under ORS 197.298(1), presumably no matter how the need for residential land is described—also does not withstand scrutiny. As noted earlier, Goal 14 requires that a UGB change "follow the procedures and requirements as set forth in the Land Use Planning goal (Goal 2) for goal exceptions." The standards for such an exception include a determination that "[a]reas which do not require a new exception cannot reasonably accommodate the use." But that criterion applies to land that does not require an exception to Goal 14, *i.e.*, land already within the UGB or specially designated land in unincorporated communities outside of a UGB. *VinCEP v. Yamhill County*, 215 Or App 414, 425, 171 P3d 368 (2007) ("areas which do not require a new exception" criterion under Goal 14 are "lands within urban growth boundaries and areas for which a Goal 14 exception has already been taken"). The exception standard requires an evaluation of whether land inside of a UGB can be developed in a way that eliminates or minimizes the need to expand a UGB. The criterion is not a factor to distinguish among lands that do require an exception to Goal 14—the exception and resource lands outside the UGB that could qualify for inclusion within the boundary.[13] So the second exception criterion, by its terms, is not relevant to classify exception and resource lands outside the existing UGB as suitable for growth.[14]

---

[13] DLCD understood that the second exception criterion did not require an alternatives analysis of lands outside the existing UGB. In its decision on petitioners' objections in the first LCDC proceeding, the department noted:

"It is not clear that [the alternative lands exception criterion] distinguishes between Goal 3 exception lands and resource lands outside of a UGB. Both require that the city follow the exceptions process for a UGB amendment and can be said to 'require a new exception.' The department understands this standard to mean that a UGB amendment is needed only if lands inside a UGB or rural lands for which an exception to Goal 14 has been taken cannot reasonably accommodate the use."

[14] The reference to the Goal 2 exception requirements in Goal 14 was eliminated in the revision to Goal 14 adopted in 2005. In its place, the goal now requires that,

"[p]rior to expanding an urban growth boundary, local governments shall demonstrate that needs cannot reasonably be accommodated on land already inside the urban growth boundary."

In addition, OAR 660-004-0010(1)(c)(C) now provides that,

"[w]hen a local government changes an established urban growth boundary applying Goal 14 as amended April 28, 2005, a goal exception is not required

The order under review approves the city's decision not to include the North Fox Ridge Road resource area in the UGB because, "pursuant to Goal 2, the city did not need to consider lands under ORS 197.298 that could not reasonably accommodate its identified need." In other parts of the order, the exclusions are justified under a generic "reasonably accommodate" standard (presumably tied to Goal 2), rather than the more discrete accommodation standards of ORS 197.298(1) and (3). In those respects, LCDC erred in applying the wrong standards and misconstrued the applicable law. ORS 183.482(8)(a).

We must next determine if those Step One and Step Two errors compel a different result under ORS 183.482(8)(a) (allowing remedy if "the agency has erroneously interpreted a provision of law and * * * a correct interpretation compels a particular action"). We turn then to petitioners' specific contentions about the application of ORS 197.298. LCDC and the city defend the LCDC order by arguing that the exclusions are justified under ORS 197.298, no matter how the residential land need is defined—whether as a need for higher-density residential land or for land suitable for an NAC.

## C. *Application of ORS 197.298*

Petitioners claim that LCDC erred in endorsing the exclusion of three exception areas—Old Sheridan Road, Riverside North, and Booth Bend Road—that should have been added to the boundary under ORS 197.298. They reason that those areas were excluded because they were unsuitable for medium-density and high-density housing, but that such a specification of need is inappropriate for the application of ORS 197.298. Rather, petitioners argue, the statute should have been applied to residential land needs as a whole. Moreover, the quantity of needed low-density residential land (341 acres) exceeded the buildable land added through the included exception areas, so petitioners reason that the other exception areas should have been brought into the boundary to meet low-density residential land needs. Finally, petitioners claim that there is no substantial evidence that the excluded exception areas could not accommodate some

unless the local government seeks an exception to any of the requirements of Goal 14 or other applicable goals[.]"

medium-density or high-density housing. More specifically, petitioners contest LCDC's findings on the excluded exception areas as well as the three excluded lower-quality resource lands tracts (West Hills, Fox Ridge Road North, and the area north of McMinnville Airport).

1. *Old Sheridan Road exception area*

In its findings on ORS 197.298(1), the city evaluated this exception area under factors that it also applied to other exception areas (annexation potential, ability to develop with adequate internal transportation circulation, limited traffic access from Highway 18, consistency with compact urban form, and public safety issues). As stated earlier, considerations of the *general availability* of public facilities and services are immaterial as part of the Step Two application of ORS 197.298. The remaining determinations by the city are relevant under ORS 197.298(1) (comparative long-term environmental, economic, social and energy (EESE) consequences resulting from the use at the proposed site). The city's decision to exclude the Old Sheridan Road exception area was based upon a balancing of those determinations.

Petitioners objected to DLCD that the city's findings failed to establish that the Old Sheridan Road exception area could not accommodate a portion of the city's residential land needs. More specifically, petitioners claimed that the city findings showed that the comparative costs of providing city facilities and services to the area varied, depending upon the service, but were not prohibitive. Petitioners disputed that there was evidence in the record to support the city's findings that Old Sheridan Road provided the sole access to the area and that the area was distant from existing public utilities and schools.

DLCD did not resolve those objections under ORS 197.298(1). Instead, DLCD concluded that it "agrees with the city's findings that transportation facilities cannot reasonably be provided to this area under ORS 197.298(3)(b)." Again, ORS 197.298(3)(b) allows resort to lower-priority land if "[f]uture urban services could not reasonably be provided to the higher priority lands due to topographical or other physical constraints." LCDC appeared to affirm on that basis, largely because Highway 18 is a limited access highway.

On review, petitioners argue that ORS 197.298(3)(b) allows resort to lower-priority land only if a package of future urban services could not be reasonably provided. Petitioners contend that LCDC's findings failed to evaluate the entire suite of urban services in excluding the Old Sheridan Road exception area and that the deficiency in the provision of transportation facilities was not due to topographical or other physical constraints. Moreover, petitioners claim that there is no substantial evidence to support the finding of unavailable transportation facilities because local streets could be extended to the area. Respondents counter that LCDC approved the exclusion of Old Sheridan Road, in part, because lack of access to Highway 18 required prohibitively expensive road improvements to the area and congestion in other access points to the highway.

We disagree with petitioners' contention that a composite of urban services must to be considered under ORS 197.298(3)(b). Although the term "urban services" is not defined in the statute, a related term, "urban facilities and services" is defined under Goal 11 to include "police protection; sanitary facilities; storm drainage facilities; planning, zoning and subdivision control; health services; recreation facilities and services; energy and communication services; and community governmental services." OAR 660-015-0000(11). That definition does not include water supply systems or roads. Goal 12 separately deals with transportation facilities, a utility that is neither "urban," being necessary to both rural and urban land uses, nor a "service." ORS 197.298(3), by its plain text, refers only to those "urban services" that could be constrained "due to topographical or other physical constraints." Thus, the text of the provision refers to a service that is urban in character and that can be physically constrained in its provision. What is a constrained urban service is a matter of proof in a particular UGB amendment proceeding, but it surely does not mean the full panoply of urban facilities and services described in Goal 11.

We do agree, however, with petitioners' contention that inefficiencies in the provision of roads to a potential urbanizing area is not sufficient to exclude that area under ORS 197.298(3)(b). Transportation facilities are not an "urban service" under the statute. It may be that LCDC's

order also implicitly rests upon excluding the Old Sheridan Road exception area from the category of candidate lands under ORS 197.298(1). As noted earlier, however, any inefficiency in the provision of urban services and facilities is not material to the analysis under ORS 197.298(1). LCDC erred in approving the exclusion on either of those bases; it should have addressed whether the city's findings were otherwise factually and legally sufficient under ORS 197.298(1).

2. *Riverside North exception area*

Petitioners next contend that the basis for excluding the Riverside North exception area—unsuitability for residential use due to "noise and odor associated with the adjacent sewage treatment plant, industrial use, and railroad"— was insufficient under ORS 197.298(3)(a) because residential use is not a "[s]pecific type[ ] of identified land need[ ]" under that statutory provision, but a more generic need that is subject to the priorities of ORS 197.298(1). Petitioners argue that LCDC's findings are deficient in failing to assess whether the Riverside North exception area could be used to satisfy non-residential land needs, in general, or for industrial uses, in particular, thereby allowing redesignation of existing industrial land within the UGB for residential uses. Petitioners finally assert that the city's decision to exclude Riverside North was inconsistent with its decision to include the Riverside South exception area, and that, in approving both actions, LCDC acted "inconsistently with official agency position or practice" and without substantial evidence.

Respondents argue that the incompatibility of any proposed residential use of the subarea with nearby industrial and institutional uses is a legitimate consideration in applying ORS 197.298(1). Based on the Step Two analysis noted earlier (that EESE considerations under Goal 2 and Goal 14, Factor 5, are applied under ORS 197.298(1)), we agree with respondents. We also agree with respondents' further contention that LCDC did not misconstrue the applicable law or fail to support its decision by substantial reason in not requiring redesignation of industrial land within the existing UGB for residential uses in order to add Riverside North for industrial purposes. Finally, petitioners' assertion that LCDC made inconsistent determinations on

the Riverside South and Riverside North areas was not pre-served, because petitioners never asserted to DLCD that the city was constrained to treat both areas in the same way.

### 3. *Booth Bend Road exception area*

Again, the city adopted findings on the considered exception areas, including the Booth Bend Road exception area, that evaluated those areas under ORS 197.298(1) based upon a balancing of factors that included the area's potential for annexation, internal transportation circulation, urban form, public safety, the overall cost-effectiveness of the pro-vision of urban facilities, and compatibility with adjacent uses, including agricultural uses. The city excluded the Booth Bend Road exception area because of limited potential for annexation, the cost-ineffectiveness of necessary road and sanitary sewer improvements, the lack of supportive neigh-borhood services and facilities, and incompatibility with adjacent agricultural uses.

Before LCDC, petitioners disputed the factual accu-racy of some of the city's findings. LCDC overruled those objections because "this area is problematic since it would be an isolated extension of the UGB across the highway, making walking to nearby destinations difficult[,]" such that it could not "reasonably accommodate the need for a compact, pedestrian-friendly urban area."

On review, petitioners argue that that specification of need is not a "[s]pecific type[ ] of identified land need[ ]" under ORS 197.298(3)(a) and, to the extent that the need arises as a consequence of the application of Goal 14, Factor 4 (efficiency of land uses on the fringe of urban areas), that con-sideration was not balanced with other Goal 14 factors in determining suitability under ORS 197.298(1). Moreover, petitioners assert that excluding the Booth Bend Road excep-tion area because of its isolated location (south of Highway 18) is inconsistent with the inclusion of other areas south of the highway (Three Mile Lane and Lawson Lane areas). Respondents counter that the city's findings appropriately considered urban form and conflicts with agricultural land in its ORS 197.298(1) analysis.

We agree with petitioners that the application of ORS 197.298(1) requires more than the consideration of pedestrian circulation. LCDC erred in failing to address whether the city's findings about other ORS 197.298(1) considerations were sufficient and were supported by the record. The city's evaluation of the cost-effectiveness of the provision of public facilities and services is immaterial to the analysis under ORS 197.298(1) during Step Two. In the same way, considerations of urban form under Goal 14, Factor 4, are more appropriately deferred to Step Three, during the full application of Goal 14 to candidate lands identified under the priorities statute.

4. *West Hills resource land area*

Following the initial remand of the MGMUP amendments by LCDC, the city analyzed resource areas with poorer soils for potential inclusion within the UGB. The city determined that an area in the West Hills west of Fox Ridge Road and Redmond Hill Road (exception areas included in the UGB in the initial LCDC proceedings) would be unsuitable. The findings in support of that conclusion identified a land need for medium- and high-density housing. The city reasoned that the sloped topography of the subarea would increase the cost of construction "anywhere from $5,000 to $15,000 per lot in additional development costs, depending on site-specific conditions"; the area was more likely to be developed with single-family residences; additional water distribution facilities and transportation access would be expensive; the area was too far from commercial areas for feasible higher-density residential development; and development would be incompatible with nearby farm and forestry operations and with a compact urban form. The city concluded that the area should be excluded from the boundary change under ORS 197.298(3).

In their DLCD objections, petitioners agreed with the city's rationale for excluding the more steeply sloped portions of the subarea, but claimed that the more gently sloped portions adjacent to the current UGB would be suitable to accommodate identified land needs. Petitioners disagreed with the city's limitation of the identified need to higher-density residential use and with the city's adopted rationale

for exclusion that relied upon the expense of water service, the feasibility and likelihood of higher-density housing in the area, and the expense of road extension and distance from commercial areas. After reiterating much of the city's findings, LCDC concluded that

"1000 Friends objects to the exclusion of this area, contending that the city erred in its findings and that the area can accommodate specific types of land needs * * *. Specifically, that this higher priority area can accommodate low-, medium-, or high-density housing even with the constraints of slope, water service costs, transportation difficulties, and should therefore be included. The Commission finds that the city established both that the West Hills area could not reasonably accommodate the city's identified need and that under ORS 197.298(3)(b), the city could not reasonably provide water, a future urban service, due to the topographical constraint."

On review, petitioner argues that LCDC's determination applies only to the more steeply sloped part of the resource area and not to the more gently sloped area adjacent to the existing UGB. Petitioners further assert that the findings do not identify which land need could not be accommodated, that the reference in the findings to the effects of inclusion of the territory on nearby agricultural land is inappropriate under ORS 197.298(1), and that water services can be extended to the lower portions of the resource area. Respondents claim that the city findings and LCDC restatement of those findings applied to the entire resource area and were sufficient under ORS 197.298(1).

We agree with petitioners in part. The city findings identified a need for higher-density housing. We concluded earlier that ORS 197.298(1) could be applied to prioritize land to satisfy that particular need. The city considered some relevant factors under ORS 197.298(1), including compatibility with adjacent agricultural land, in evaluating the resource area. However, LCDC relied upon the city's findings that applied Goal 14, Factor 3 ("[o]rderly and economic provision for public facilities and services"), in determining suitability under ORS 197.298(1). Because that factor is applied under Goal 14 to evaluate, but not determine, candidate

lands (Step Three in the analysis), LCDC erred in its application of ORS 197.298 to the city's findings. Petitioners have not otherwise shown that LCDC incorrectly applied ORS 197.298 or misunderstood the substantial evidence test in approving the city's findings on this issue.

### 5.  *Area north of Fox Ridge Road*

A portion of the area north of Fox Ridge Road (Tax Lot 700) was added to the UGB. Petitioners argue that an additional corridor of land in this area should have been included (Tax Lots 100, 200, 300, and 400). The city determined that Tax Lot 100 and portions of Tax Lot 200, although within the boundaries of the Northwest NAC, should be excluded from the UGB because of limited connectivity with the existing road system and "the steep slopes in the southern portions of these two properties leave only perhaps a 200-foot wide buildable corridor extending across tax lots 700, 200 and 100." The city concluded that those properties should not be included in the boundary "as permitted by ORS 197.298(3)(a)."

In their DLCD objections, petitioners complained that the city failed to address the potential inclusion of Tax Lots 300 and 400 and that the city's factual findings on the soil composition, road connectivity, and buildable lands in the resource area were not supported by the record. LCDC reiterated the city's findings, concluding that,

> "[f]or the reasons cited above, the city concluded that the needs identified in the MGMUP cannot be reasonably accommodated by the areas of Class III and Class IV soils within tax lot R4513-00100 or the northern portion of tax lot R4418-00200. The city, therefore, did not include these lands in its expanded UGB, purportedly under ORS 197.298(3)(a). The Commission concludes that the city erred in excluding the lands under ORS 197.298(3)(a). However, pursuant to Goal 2, the city did not need to consider lands under ORS 197.298 that could not reasonably accommodate its identified need."

After noting petitioners' objections "to the exclusion of tax lot 100, the northern portion of tax lot 200, and land west of tax lot 100 from the proposed UGB" and their assertion that the

city's findings on the soil composition of Tax Lots 100 and 200 were wrong, LCDC decided that

> "[t]he Commission concludes that the city has established that the excluded lots will have limited future connectivity, are constrained by slope that leaves a limited building corridor, and would create an island of agricultural activity and cut off tax lots 1100 and 1000 from existing farm operations."

On review, petitioners claim that LCDC's findings addressed only part of the area they argued should have been included and failed to address Tax Lots 300 and 400. Petitioners also contend that the reasons for excluding two of the tax lots—road connectivity and cutting off farm parcels—are insufficient if the entire area is included. Respondents argue that LCDC affirmed the city's findings on the unsuitability of Tax Lots 100 and 200 under ORS 197.298 based on a number of relevant considerations (topography, relation to existing and future development, connectivity, and effect on agricultural operations) and that LCDC did not err in its construction of applicable law or application of the substantial evidence test in reaching those determinations.

We agree with petitioners that LCDC failed to address their core contention—that the city did not evaluate, in its adopted findings, whether a larger area of properties north of Fox Ridge Road, with lower-class soils, could reasonably accommodate the city's identified need for residential land instead of the lower-priority land added for that purpose, and that such an evaluation was necessary under ORS 197.298(1).[15] LCDC should have determined whether the city's rationale for excluding Tax Lots 100 and 200 was based upon consequences and compatibility considerations relevant under ORS 197.298(1) and whether that rationale was legally sufficient without consideration of a larger area.

---

[15] On remand of the original UGB decision, DLCD directed the city to "identify areas with class 3 and 4 agricultural soils and either (1) include them in the UGB instead of areas with class 1 and 2 soils, if any, or (2) explain why they should not be included based on the standards in ORS 197.298(3)." The city identified the properties with Class III and IV soils that were within one mile of its 1981 UGB. It is not clear whether Tax Lots 300 and 400 fit within that parameter. The "discussion areas" map of alternative lands attached to petitioners' opening brief appears to exclude Tax Lots 300 and 400.

Instead, LCDC sustained the city's determination "pursuant to Goal 2," using a broader and incorrect "reasonably accommodate" standard in the application of ORS 197.298. And, LCDC did not deal with petitioners' contention that the city's findings were insufficient under ORS 197.298(1) because the city did not address whether the consequences and compatibility concerns about bringing Tax Lots 100 and 200 into the boundary should have been mitigated by including a differently configured area. That determination was necessary to LCDC's conclusion that the city's findings demonstrated its compliance with ORS 197.298(1).

### 6. *Other resource land areas*

After the remand, the city considered including in the UGB three lower-quality agricultural tracts near the municipal airport: a 197-acre tract north of the airport that is bordered by farmland on three sides; a smaller 35-acre tract on Highway 18 that is situated south of the air museum, and surrounded by the existing UGB except along an access road; and a large tract east of the airport. The city made collective findings on those properties under ORS 197.298, although some of the collective findings appear to be specific to a particular, but unidentified, property (*e.g.*, "[t]his property is also immediately adjacent to the airport approach zone for Runway 17," "[t]his land * * * would be bordered by actively farmed land on three of its four sides"). The findings note concerns with the effects of high-density housing on flight safety and use of adjacent agricultural land as the bases for excluding the properties from the boundary. The city concluded:

> "For the above noted reasons, the City concludes that specific types of land needs as identified in the MGMUP cannot be reasonably accommodated on the lands north and east of the McMinnville Municipal Airport, on which are found predominantly Class III or Class IV soils. The City, therefore, has not included these lands in its expanded urban growth boundary, as permitted by ORS 197.298(3)(a)."

In their DLCD objections, petitioners complained that the city findings made collective assessments about differently situated properties and that the smaller tract next to the museum could be used to satisfy low-density residential land needs. LCDC, after taking administrative notice of the

airport master plan, concluded that "[d]evelopment of these lands at urban residential densities would be incompatible with the long range plans for the airport, * * * and would potentially threaten the airport's viability." The commission reiterated some of the city's collective findings that were written as particular to one property. After noting petitioners' concern that the small tract adjacent to the air museum was not analyzed in the findings, LCDC concluded that "the city established that the area cannot reasonably accommodate an identified need due to safety issues related to the airport."

On review, petitioners argue that the smaller 35-acre parcel, which is composed of Class III soils, has particular priority under ORS 197.298(1)(b) (giving second priority to exceptions lands and "resource land that is completely surrounded by exception areas"). Petitioners claim that the city and LCDC did not address that property in particular, instead they lumped it with two other properties that have different compatibility issues. Finally, petitioners argue that, if the basis for excluding this parcel is its unavailability for high-density residential use, that basis does not excuse its potential use for low-density residential needs. Respondents counter that airport safety concerns are relevant issues under ORS 197.298(1) in the application of Goal 14, Factor 3 (orderly and economic provision of services), Factor 4 (maximum efficiency of land uses), and Factor 5 (EESE consequences).

LCDC's findings on this tract are inadequate for judicial review. As noted earlier, the ORS 197.298(1) consequences and compatibility factors apply differently, depending upon whether the quantified land need is for land to be used for low-density residential, mixed-use, or higher-density residential uses. The findings do not explain why the tract was evaluated for higher-density residential land needs alone. Moreover, the findings set out common compatibility concerns caused by proximity to a runway and flight paths for properties located in different areas and, presumably, with different compatibility issues. As such, the findings lack substantial reason because they do not articulate the ORS 197.298 evaluation for the smaller 35-acre parcel.

Finally, petitioners claim that they called the city's attention to other potential higher-priority resource lands (the Riverside area, land south of the airport, and land south of Three Mile Lane and west of Booth Bend Road), but that those sites were not evaluated, contrary to the then applicable version of OAR 660-004-0020(2)(b)(C),[16] a rule applicable to UGB changes made under the older version of Goal 14. Petitioners argue that LCDC erred in failing to remand the decision to the city for that consideration.

The above-cited rule set policy on how to comply with the reasons exception criterion in Goal 2, Part II(c), that "[a]reas which do not require a new exception cannot reasonably accommodate the use." That rule stated that

> "[s]ite specific comparisons are not required of a local government taking an exception, unless another party to the local proceeding can describe why there are specific sites that can more reasonably accommodate the proposed use. A detailed evaluation of specific alternative sites is thus not required unless such sites are specifically described with facts to support the assertion that the sites are more reasonable by another party during the local exceptions proceedings."

As we noted earlier, however, that exception criterion does not apply to evaluating land outside a UGB—all of which required a new exception to Goal 14 as applicable here—for inclusion in the boundary. Instead, it requires determining if land already inside the UGB—land which does not require a new exception—can reasonably accommodate the need. As such, OAR 660-004-0020(2)(b)(C) did not require the city to evaluate any particular alternative site proposed by petitioners.

Instead, the city applied particular criteria (*e.g.*, within one mile of the 1981 UGB, composition of Class III or IV soils, and within prescribed geographic boundaries) to inventory the lands to be studied. Petitioners did not object to the city or LCDC that those inventory criteria were unlawful or that they had been misapplied to petitioners' suggested alternative resource lands areas. Thus, the commission did

---

[16] OAR 660-004-0020 was amended in 2011. Those amendments are not relevant to the contentions on review.

not err in failing to require the city to study those areas for inclusion.

D.  *Application of Goal 14 locational factors*

Petitioners' first set of contentions relate to Step Two—the application of Goal 14 in determining whether the quantity of land in the priority class is inadequate under ORS 197.298(1). Petitioners claim that, in separately applying the locational factors of Goal 14 to the areas proposed to be added to the UGB, the city and LCDC erred in failing to consider all of the available exception lands collectively and consistently and did not explain how the locational factors— in particular, Factors 3 (public facilities and services), 4 (efficiency of land uses), and 7 (compatibility with agricultural activities)—were balanced to include some exception lands and not others. They assert that Factor 7 was not applied at all in the evaluation of the available exception areas, but was instead applied only to the already included territory.

Respondents protest that those arguments were not made to LCDC and that the commission is not obliged to determine on its own whether those particular deficiencies in the local decision existed. As we said before, petitioners' contentions must be particularly raised before LCDC in order to merit review in this court. Petitioners generally asserted below—in the midst of dozens of more specific objections— that "the city has not conducted a coordinated land priority analysis around the entire UGB perimeter." That is insufficient to raise the specific objection that the city failed to completely consider any particular Goal 14 factor in its evaluation of whether exception lands could reasonably accommodate an identified land need.

Petitioners next argue that LCDC erred in approving the city's Goal 14 evaluation of both the low-value farmland that was excluded from the UGB and the high-value farmland that was included. Petitioners assert that the city and LCDC erred in failing to consider Factor 3 (public facilities and services) in comparing alternative lower-quality resource lands, made no findings about the availability of public services to the Airport North and the Fox Ridge Road North resource areas, and inconsistently evaluated the public services factor in comparing the West Hills resource area

with the higher-quality Southwest and Grandhaven areas. According to petitioners, LCDC and the city further erred in not balancing Factor 4 (efficiency of land uses) with other factors in evaluating alternative resource lands, instead subsuming that consideration in the application of ORS 197.298, and in applying Factor 4 to land outside of the "existing urban area." Petitioners also complain that Factor 6 (retention of agricultural lands) was applied in a cursory manner to available resource lands and that LCDC made no findings on that complaint.

Some of those contentions were preserved; others were not. Before the agency, petitioners cited ORS 197.298 and Goal 14 as the bases for their contention that the city erred in excluding certain exception areas and higher-priority resource land. Much of the argument was framed around whether those properties could reasonably accommodate an identified land need, a contention apparently rooted in the requirements of ORS 197.298. As we concluded earlier, the relevant Goal 14 factors in the sorting of suitable higher-priority land under ORS 197.298(1) are Factor 5 (EESE consequences) and Factor 7 (compatibility with agricultural activities) and their analogues in the Goal 2 exception criteria. We earlier determined the legal sufficiency of the city's consideration of exception lands and higher-priority resource lands under ORS 197.298(1); petitioners' restated Goal 14 contentions about the excluded exception and higher-priority resource lands raise no different and relevant claims.

Petitioners' remaining contentions concern Step Three, the application of Goal 14, Factor 7 (compatibility of proposed urban uses with agricultural lands) to the lands considered for inclusion in the boundary. The city's Factor 7 findings from 2003 on the Norton Lane, Three Mile Lane, Southwest, Northwest, and Grandhaven areas described adjacent agricultural land uses in general terms ("actively farmed land," "active farm use," "agricultural farm use," "actively farmed agricultural land," and "large-parcel farm operations") before concluding that,

> "[t]he Council concludes that the proposed expansion areas will not create compatibility conflicts between uses. Much

of the existing UGB is adjacent to resource lands that are currently in agricultural uses. Expansion of the UGB would not create new uses that would create new types of compatibility issues."

Before LCDC, among other assertions, petitioners argued that the city's findings on the application of Factor 7 to four of those areas were (1) incomplete because the findings did not consider the particular agricultural activities of nearby land and compare compatibility conflicts among the considered resource lands; and (2) inaccurate because the findings do not examine the boundaries of the redrawn resource lands areas that were altered following remand. In its order, LCDC reiterated the city's findings and affirmed, without further analysis, that the city properly applied Factor 7. We agree with petitioners that LCDC erred in not requiring additional findings on Factor 7. The existing findings were not sufficiently descriptive of nearby agricultural uses to allow comparison among the candidate sites and were inaccurate as to the redrawn boundaries of the resource areas. We reject petitioners' remaining Goal 14 contentions.

## VI. CONCLUSIONS

We conclude that the commission erroneously interpreted ORS 197.298 by failing to require that the city first separately quantify its needs for low-density residential land, higher-density residential land, and mixed-use land (Step One) and then apply ORS 197.298(1) and (3) to each of those quantified needs (Step Two), and in permitting the city to exclude land from further consideration under ORS 197.298(1) for immaterial reasons. Further, correct application of ORS 197.298 would compel different actions by the commission in its evaluation of the city's justification for excluding particular exception and resource areas under ORS 197.298. Thus, a remand is appropriate under ORS 183.482(8)(a)(B) (allowing remand to an agency for "further action under a correct interpretation of the provision of law").

On remand, LCDC should respond to petitioners' contentions by making additional findings or taking appropriate action in its review of the city's submissions to (1) determine what particular and quantified land use needs are to be accommodated by any additional land to be added to

the McMinnville UGB; (2) apply ORS 197.298 to determine the land available to accommodate those quantified land use needs; (3) apply Goal 14 to justify the inclusion of suitable land in any amended UGB; and (4) take any other necessary action under a correct interpretation of the governing standards, including a determination of whether the city's submission, "on the whole, conform[s] with the purposes of the goals and any failure to meet individual goal requirements is technical or minor in nature" under ORS 197.747.

Reversed and remanded.