Argued and submitted October 12, affirmed on petition and cross-petition
December 29, 2016

LAND WATCH OF LANE COUNTY
and Lee D. Kersten,
*Respondents*
*Cross-Petitioners,*

*v.*

LANE COUNTY,
*Respondent below,*

*and*

CITY OF COBURG
and Interstate Properties, Inc.,
*Petitioners*
*Cross-Respondents.*

Land Use Board of Appeals
2016003, 2016004; A162909

388 P3d 434

Milo Mecham argued the cause for petitioners-cross-respondents. With him on the joint briefs were Daniel Terrell and Law Offices of Bill Kloos PC.

William K. Kabeiseman argued the cause for respondents-cross petitioners. With him on the brief were Carrie A. Richter and Bateman Seidel Miner Blomgren Chellis & Gram, P.C.

Before Duncan, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

**DEVORE, J.**

This case involves review of a decision of the Land Use Board of Appeals (LUBA). In 2015, following urbanization studies and public hearings, the City of Coburg and Lane County coadopted two ordinances to amend the city's urban growth boundary (UGB) and to revise the city's transportation system plan. Respondents, Land Watch and Kersten, appealed to LUBA, contending that the amended UGB was not supported by an adequate factual basis and that the county did not comply with Oregon statutes, statewide planning goals, and administrative rules.[1] LUBA remanded both ordinances because the local findings were insufficient to satisfy ORS 197.298 and factors pertaining to Goals 9 and 14. The city and county seek review of LUBA's order. Land Watch cross-petitions, contending that the city used two mutually exclusive ways of calculating its employment-based land need and that the city had "double-counted" future employment growth. We affirm on the petition and cross-petition.

## I. BACKGROUND

A. *Local Government Proceedings*

In 2010, the City of Coburg conducted an urbanization study, as part of a periodic review, to evaluate its land needs in light of future employment and residential growth over a period of 20 years. *See* ORS 197.628 - 197.644 (periodic review requirement). The study concluded that the city would need to expand its UGB to meet its projected growth.[2]

The urbanization study was updated in 2014 with an addendum, reflecting changes between 2010 and 2014. Generally, the addendum concluded that there was a "need for a UGB expansion * * * based on forecast need for large industrial sites within Coburg and the Central Lane County

---

[1] Land Watch and Kersten are jointly represented by counsel and did not file separate briefing. For ease of reference, throughout the opinion we refer to the parties collectively as "Land Watch."

[2] "A UGB is the part of the land use map in a city's comprehensive plan that demarcates the area around a city that is available for expansion and future urban uses." *1000 Friends of Oregon v. LCDC*, 244 Or App 239, 241, 259 P3d 1021 (2011) (*McMinnville*).

region." The addendum concluded that the "scenarios," which the city council had selected in 2010, remained the recommended sites for expansion. In 2014, the city also conducted a Regional Economic Analysis (REA), prepared by an economic and development services company, E.D. Hovee. The REA considered "scenarios," each of which would require expansion of Coburg's UGB.[3]

"[W]hen a city amends its comprehensive plan, including any amendment to its UGB, the city must justify the change as being consistent with the [Land Conservation and Development Commission (LCDC)] goals, except to the extent that compliance with a goal is excused by an exception to its application." *1000 Friends of Oregon v. LCDC*, 244 Or App 239, 243, 259 P3d 1021 (2011) (*McMinnville*); *see also* ORS 197.175 (requiring cities and counties to exercise land planning and zoning responsibilities in accordance with state land use statutes and goals approved by LCDC).

In this case, 11 discrete areas of land were considered as sites for the UGB expansion. Of those areas, Areas 1, 6, 7, and 8 were predominantly agricultural land that had been zoned for exclusive farm use (EFU). Maps of the UGB were employed, illustrating alternative arrangements to address the city's projected land needs. The city considered a map that illustrated growth using "exception lands." They are lands outside the UGB in which the city or county can take an "exception" to the application of a goal to particular property that is regulated by LCDC substantive standards. *See Waste Not of Yamhill County v. Yamhill County*, 240 Or App 285, 287-89, 246 P3d 493 (2010), *adh'd to as modified on recons*, 241 Or App 199, 255 P3d 496 (2011) (explaining the relationship between goals and exception process). Other alternatives illustrated growth using EFU land.

---

[3] Scenario A was "modeled to align with the forecast methodology provided with the 2010 Urbanization Study." Scenario B was "predicated on the economic opportunity for Coburg to serve regional needs for large 20+ acre sites that require I-5 freeway access *in addition* to capturing its Safe Harbor share of regionally forecast job growth[.]" (Emphasis in original.) Three "variations" on Scenario B were included in the REA (B1, B2, and B3). Each variation illustrated a different "regional market capture rate"—10, 20, and 30 percent, respectively.

In its order, LUBA determined that the city and county "determined the need for employment land * * * consistent with [Scenarios] B1 and B2, and whatever assumptions and studies justified those figures."

The city considered alternatives that proposed using those 11 areas for residential and employment-based expansions. The urbanization study noted that "[a]ll employment land expansion alternatives show expansion occurring on the east side of I-5 in order to take advantage of the excellent transportation opportunities presented at this location." The study recommended, for employment-related growth, an expansion of 106 acres using the entirety of "Study Area 8." That area, comprised of EFU land, "would require the City to expand further across I-5 * * * as well as extend[] water and sewer services to the areas." With regard to residentially-related growth, the study recommended an expansion that included "Study Areas 1, 2, 5 and 6." The city, however, determined that Areas 5 and 7 were unavailable or unsuitable for employment-based development, despite its recognition that those areas were, in fact, "higher-priority" lands under the applicable land use standards for inclusion in an expansion of the UGB.

The study's recommendations were based, in part, on an analysis of estimated future population and employment growth (population and employment forecast). In 2010, the urbanization study had explained:

"Based upon State forecasted employment growth, employment growth within Coburg's UGB is anticipated to yield an additional 615 new jobs, for an employment total of 4,035 in 2030. This projection is *based upon one of the Safe Harbor[s]*. Safe Harbors were established in OAR 660-024-0040(8)(a), and adjusted based on local knowledge and/or community vision. As part of this process, the employment growth rates are based on the trends at the County level, which have been estimated by the Oregon Employment Department. As a result, Coburg's employment is projected to grow at a rate equal to the County or Regional job growth rate provided in the most recent forecast published by the Oregon Employment Department. The employment growth rate has been evaluated by applying the annual average growth rate (AAGR) percentages from OED's 10-year Lane County employment sector forecast (2006-2016) to Coburg's industry sectors (2008-2030)."

(Emphasis added.) In the 2014 addendum, the city explained that it was relying on the 2010 data for its analysis "because the long-term forecast is expected to be realized, and

therefore the calculation of employment change requires a starting figure reflecting Coburg's existing employment capacity and redevelopment potential." (Underscoring omitted.) The 2014 addendum added:

> "If Coburg's job growth rate were adjusted upwards to reflect the updated overall growth expectations for Lane County ***, the employment gain within Coburg's UGB would double from the previous projection of an added 615 jobs to 1,292 net added jobs over a 20-year planning horizon. It is noted *** that a truly sector specific forecast was not possible given the information that economist Eric Hovee was provided [for the REA]."

The projected employment-based land need, as determined by Hovee in the REA, would become a contested issue before LUBA and again before this court.

Coburg's city council held public hearings and adopted the UGB expansion. The Lane County Planning Commission recommended to the Board of County Commissioners that it approve an ordinance and coadopt the city's plan. On December 8, 2015, the Board of County Commissioners coadopted two ordinances: (1) ordinance PA 1314, coadopted by the city, which permitted a city transportation system plan beyond the city limits, within the future growth areas, and (2) ordinance PA 1315 amending and coadopting the city's plan to extend its UGB "by adding and redesignating 105.72 acres of land for Light Industrial use, 2.0 acres for High Density Residential use, 15.0 acres for Medium Density use, and 131.84 acres for Traditional Residential use."[4]

## B. *LUBA Proceedings*

Land Watch appealed both ordinances to LUBA, based on legal standards and the factual basis for the decisions. Before we address those arguments, we summarize

---

[4] In its findings and conclusions supporting the ordinance, the county explained that changes to a city's UGB must be coadopted by the county because the changes "remove certain property from the Rural Comprehensive Plan." The county made a number of findings in support of its approval consistent with the criteria outlined in the Lane County Code (LC). *See* LC 12.050 (method of adoption and amendment); LC 16.400 (rural comprehensive plan amendments).

the legal framework which is applicable to this case, and which was described in *McMinnville*, 244 Or App at 242-45.

The priorities for the types of lands that may be included within a UGB are established in ORS 197.298. In relevant part, "exception lands" have higher priority for inclusion in the UGB than EFU lands. When a local government must choose between agricultural lands, it must generally choose the agricultural lands with less productive soil. These priorities are reflected in ORS 197.298 which provides:

"(1)  In addition to any requirements established by rule addressing urbanization, land may not be included within an urban growth boundary * * * except under the following priorities:

"(a)  First priority is land that is designated urban reserve land under ORS 195.145, rule or metropolitan service district action plan.

"(b)  If land under paragraph (a) of this subsection is inadequate to accommodate the amount of land needed, second priority is land adjacent to an urban growth boundary that is identified in an acknowledged comprehensive plan as an exception area or nonresource land. Second priority may include resource land that is completely surrounded by exception areas unless such resource land is high-value farmland as described in ORS 215.710.

"(c)  If land under paragraphs (a) and (b) of this subsection is inadequate to accommodate the amount of land needed, third priority is land designated as marginal land pursuant to ORS 197.247 (1991 Edition).

"(d)  If land under paragraphs (a) to (c) of this subsection is inadequate to accommodate the amount of land needed, fourth priority is land designated in an acknowledged comprehensive plan for agriculture or forestry, or both.

"(2)  Higher priority shall be given to land of lower capability as measured by the capability classification system or by cubic foot site class, whichever is appropriate for the current use.

"(3)  Land of lower priority under subsection (1) of this section may be included in an urban growth boundary if

land of higher priority is found to be inadequate to accommodate the amount of land estimated in subsection (1) of this section for one or more of the following reasons:

"(a)   Specific types of identified land needs cannot be reasonably accommodated on higher priority lands;

"(b)   Future urban services could not reasonably be provided to the higher priority lands due to topographical or other physical constraints; or

"(c)   Maximum efficiency of land uses within a proposed urban growth boundary requires inclusion of lower priority lands in order to include or to provide services to higher priority lands."[5]

Closely related, Goal 14, OAR 660-015-0000(14), establishes the goal for urbanization is:

"To provide for an orderly and efficient transition from rural to urban land use, to accommodate urban population and urban employment inside urban growth boundaries, to ensure efficient use of land, and to provide for livable communities."

In addition, Goal 14 provides standards of "Land Need" that involve setting or changing a UGB:

"Establishment and change of urban growth boundaries shall be based on the following:

"(1)   Demonstrated need to accommodate long range urban population, consistent with a 20-year population forecast coordinated with affected local governments, or for cities applying the simplified process under ORS chapter 197A, a 14-year forecast; and

"(2)   Demonstrated need for housing, employment opportunities, livability or uses such as public facilities, streets and roads, schools, parks or open space, or any combination of the need categories in this subsection (2). * * *."

Goal 14 describes factors for "Boundary Location" that involves changes to the UGB. Those factors are introduced by the statement that "[t]he location of the urban

---

[5] ORS 197.298 (2013), which was operative at all relevant times in this case, has since been amended, but those amendments do not apply in this case and are immaterial. *See* Or Laws 2013, ch 575, § 12. References to ORS 197.298 throughout this opinion are to the current version of the statute.

growth boundary and changes to the boundary shall be determined by evaluating alternative boundary locations consistent with * * * ORS 197.298" as well as the factors related to Goal 14. OAR 660-015-0000(14).

As we explained in *McMinnville*, "ORS 197.298 supplements the Goal 14 criteria used to justify a UGB change. The statute requires that land be added to a UGB in a priority sequence." 244 Or App at 244. Therefore, ORS 197.298(1)

"requires that the statutory priorities be applied to UGB amendments '[i]n addition to any requirements established by rule addressing urbanization,' *i.e.*, Goal 14 and its implementing administrative rules. The priority statute directs the application of different, but somewhat analogous, factors in approving UGB changes than those mandated by Goal 14."

*Id.* at 245.

We have interpreted ORS 197.298 and Goal 14 to work harmoniously, even if in tension. *Id.* at 260-65. Accordingly, we have outlined a three-step process "to justify the inclusion or exclusion of the sorted lands and any remaining choices about what land to include [within a UGB]." *Id.* at 254. We need not revisit here the process outlined in *McMinnville*.[6] For this case, it suffices to say that the "application of all of the provisions in Goal 14 to the resulting UGB change *is required* * * *. The application of Goal 14 to the land that results from the prioritization of ORS 197.298 allows the *separate and full use of both policies* in justifying a UGB change that is contemplated by the priorities statute." *Id.* at 266 (emphases added).

For our review, we summarize Land Watch's two contentions before LUBA that are pertinent here. First, Land Watch contended that the city had impermissibly excluded higher-priority lands from inclusion in the UGB (exception lands and EFU land with Class 4 soils). Land Watch disputed the city's conclusions that Areas 5 and 7 were "inadequate" or "unusable." Second, Land Watch contended that

---

[6] Those three steps, in brief, are determining the land needed under ORS 197.298(1), determining the adequacy of candidate lands under ORS 197.298 and Goal 14, and determining which candidate lands should be included under Goal 14. *McMinnville*, 244 Or App at 255-66.

the city had not properly based a UGB decision on the 2010 urbanization study or 2014 addendum, because the study had impermissibly calculated its REA employment forecasts. As its premise, Land Watch assumed that there are two, mutually exclusive options for calculating an employment projection—a safe harbor method and a stand-alone approach. Therefore, Land Watch contended that the city had used the safe harbor method but then impermissibly augmented that calculation.[7] In a related subassignment of error, Land Watch contended that the city had "double-count[ed] large-lot industrial jobs."[8]

In its order, LUBA agreed with some of Land Watch's contentions. LUBA observed that the county's brief "neither acknowledg[ed] nor directly respond[ed] to" Land Watch's arguments on a number of issues. LUBA concluded, among other things, that there was no substantial evidence for the exclusion of Areas 5 and 7 because the city and county had not properly applied the three-step process outlined in *McMinnville*, 244 Or App at 239. LUBA ruled that the city and county had not satisfied the requirements under ORS 197.298 and under the Goal 14 factors. That is, the city and county did not properly justify their decision to exclude areas of inferior agricultural quality while including better agricultural lands within an expanded UGB.

With regard to Land Watch's argument that the city had "double-counted" its employment-based forecast in the REA, LUBA concluded that the "OAR 660-024-0040(9)(a) safe harbor does not preclude taking into account additional demand for employment land that may be generated by regional forces that may have little or nothing to do with the city's population growth. *** [T]he Goal 9 rule, OAR 660-009-0015 (1) and (2) expressly permit such considerations."

---

[7] In its petition to LUBA, Land Watch contended that "Scenario A" had been "improperly calculate[ed]." In its cross-petition to this court, however, Land Watch does not make a clear challenge involving the calculation of "Scenario A." Land Watch states, for example, that the city "should have stopped *** with its 'Scenario A' safe harbor jobs forecast and corresponding land need."

[8] That argument was based upon employment forecasts as presented in tables within the REA. Land Watch argued that the "324 jobs in Scenario A are an already-counted *subset* of Coburg's large-lot job capture—and they cannot be counted a second time as part of Scenario B." (Emphasis in original; boldface omitted.)

LUBA also concluded that Land Watch had had "the burden of demonstrating error," and that Land Watch had "failed to demonstrate that [the city and county] improperly double-counted large-lot industrial jobs." LUBA issued a final order remanding the ordinances reflecting the proposed UGB expansion and transportation system plan.

## II. ANALYSIS

### A. *Petition for Judicial Review*

In its petition for judicial review, the city and county make three assignments of error. We reject, without discussion, the county's second and third assignments. We write briefly to explain our rejection of the county's first assignment. In the first assignment, the city and county assert that LUBA erred in concluding that the county had erroneously construed ORS 197.298 and misapplied the analysis outlined in *McMinnville*. The city and county rejoin that "LUBA ignored the established standards of review and dismissed substantiated local findings that supported Coburg's conclusions regarding the inclusion of lower priority land pursuant to ORS 197.298." The city and county stress that they had substantial evidence for their reasoning. The city and county posit that so long as a city "considers the actual appropriate factors as determined * * * [under *McMinnville*], and makes its decision based on how those permissible elements work to form a decision set concerning the inclusion or exclusion of available land," then a review of other applicable factors should not "invalidate" the city's decision-making process.

We reject those arguments. Our task on judicial review is to determine whether LUBA's order is "unlawful in substance." ORS 197.850(9)(a). Initially, we are persuaded, on this record, that LUBA correctly ruled that the city and county failed to follow the McMinnville analysis. That is, the city and county failed to adhere to the priorities required by statute and goal. It does not suffice to say that the city and county merely considered them. *McMinnville*, 244 Or App at 266 ("[A]pplication of all of the provisions in Goal 14 to the resulting UGB change is required * * *."). Moreover, to the extent that the parties argue about substantial evidence,

we have reviewed the record and LUBA's decision, and we are persuaded that LUBA properly understood and applied its substantial evidence standard. *See Barkers Five, LLC v. LCDC*, 261 Or App 259, 348, 323 P3d 368 (2014) ("[O]ur role is not to review * * * for evidentiary support. Instead, we determine whether [the board] understood and applied the substantial-evidence standard correctly."). Therefore, we do not disturb LUBA's determinations that the city and county had not satisfied the requirements under ORS 197.298 and under the Goal 14 factors.

## B. *Cross-Petition*

We turn to Land Watch's cross-petition and address LUBA's rulings, both concerning the city's REA and future employment projections or "forecasts." Land Watch characterizes LUBA's ruling as concluding that "Coburg could use two methods of calculating the city's industrial land needs and add them together to determine its need for a UGB expansion for industrial land, when the methods are legally mutually exclusive." We address the cross-petition in two parts, as LUBA did. First, we consider LUBA's interpretation of OAR 660-024-0040(9)(a) to determine whether LUBA's interpretation of that "safe harbor" rule was unlawful in substance. Second, we consider LUBA's ruling that there was substantial evidence supporting the city's employment forecast—that is, the issue of so-called "double-counting" of large-lot industrial jobs.

### 1. *OAR 660-024-0040(9)(a)*

LUBA ruled that the OAR 660-024-0040(9)(a) "safe harbor" does not preclude a city from considering additional demand for employment land, when completing an "employment forecast." As we will explain, we conclude that the ruling was not unlawful in substance.

Goal 9 provides that urban planning in comprehensive plans must "[i]nclude an analysis of the community's economic patterns, potentialities, strengths, and deficiencies as they relate to state and national trends." OAR 660-015-0000(9); *see also* ORS 197.712(2) (codification of Goal 9 requirements for urban comprehensive plans). Several other administrative rules direct and focus the analysis under

that Goal 9 requirement. At issue here is the city's application of the "safe harbor" provision, OAR 660-024-0040(9), which provides, in part:

"The following safe harbors may be applied by a local government to determine its employment needs for purposes of a UGB amendment under this rule, Goal 9, OAR chapter 660, division 9, Goal 14 and, if applicable, ORS 197.296.

"(a)  A local government may estimate that the *current number of jobs in the urban area* will grow during the 20-year planning period at a rate equal to either:

"(A)  The county or regional job growth rate provided in the most recent forecast published by the Oregon Employment Department; or

"(B)  The population growth rate for the urban area in the appropriate 20-year coordinated population forecast determined under Rules in OAR 660, div 32."

(Emphasis added.)

That rule cannot be read in isolation. As LUBA explained, OAR 660-024-0040(9) finds context in relation to another rule, OAR 660-009-0015, which addresses "economic opportunities analyses" (EOA). Cities and counties must engage in economic opportunities analyses, and those analyses must contain information required by that rule. The analyses should include the following information:

"(1)  Review of National, State, Regional, County and Local Trends. The economic opportunities analysis must identify the major categories of industrial or other employment uses that could reasonably be expected to locate or expand in the planning area based on information about national, state, regional, county or local trends. This review of trends is the principal basis for estimating future industrial and other employment uses as described in section (4) of this rule. A use or category of use could reasonably be expected to expand or locate in the planning area if the area possesses the appropriate locational factors for the use or category of use. Cities and counties are strongly encouraged to analyze trends and establish employment projections in a geographic area larger than the planning area

and to determine the percentage of employment growth reasonably expected to be captured for the planning area based on the assessment of community economic development potential pursuant to section (4) of this rule.

"(2) Identification of Required Site Types. The economic opportunities analysis must identify the number of sites by type reasonably expected to be needed to accommodate the expected employment growth based on the site characteristics typical of expected uses. Cities and counties are encouraged to examine existing firms in the planning area to identify the types of sites that may be needed for expansion. * * *.

"* * * * *

"(4) Assessment of Community Economic Development Potential. The economic opportunities analysis must estimate the types and amounts of industrial and other employment uses likely to occur in the planning area. The estimate must be based on information generated in response to sections (1) to (3) of this rule and must consider the planning area's economic advantages and disadvantages. * * *."

OAR 660-009-0015.

Read in that context, we agree with LUBA that the safe harbor set out under OAR 660-024-0040(9) does not preclude a city, in its EOA analysis or an "employment forecast," from considering other employment-based needs for a UGB expansion. A city is not precluded from projecting a need that considers additional employment opportunities from outside the urban area. A city may have many relevant considerations when estimating employment-based growth needs and is not bound by the safe harbor of OAR 660-024-0040(9) to consider the prescribed growth rate in isolation. Rather, as noted in OAR 660-009-0015(1), for example, "[c]ities and counties are *strongly encouraged* to analyze trends and establish employment projections in a geographic area *larger* than the planning area and to determine the percentage of employment growth reasonably expected to be captured for the planning area based on the assessment of community economic development potential" outlined under that rule. (Emphases added.) Therefore, OAR

660-024-0040(9) may limit a calculation of the 20-year projected growth of the "current number of jobs *in* the urban area." (Emphasis added.) The rule, however, does not prohibit a city from considering, as part of its overall analysis, growth from larger projected employment trends outside that urban growth area.[9]

## 2. *"Double-Counting" in REA Employment Forecasts*

Before LUBA and now again before this court, the parties disputed how Hovee arrived at the particular calculations in the REA for Scenarios B1, B2, and B3, and whether those projections were permissibly calculated. At the heart of this argument is a chart titled, "Coburg Industrial Scenarios with Regional Large Site Industrial Capture," prepared by Hovee. That chart is described as "depict[ing] results of alternative regional capture rates that might be considered in terms of resulting 20-acre land demand *added to* existing local industrial need as previously indicated for [Scenario A]." (Emphasis in original.)

Land Watch challenges that, in determining a final employment-based land need, the city took a subset of the "Scenario A" calculation and reused it in calculating "Scenario B." Relying on that understanding of the urbanization study, Land Watch asserts that, because the analysis reused the same subset of projected employment-based need, the analysis impermissibly "resulted in a double-counting of employment need."[10] That is, Land Watch contends that the projected land need was inflated, because both "Scenario A safe harbor and the add-on 'regional' Scenario B1 land need determinations identified 20+ acre parcel sizes as a necessary special site characteristic for industrial land."

In its response brief to LUBA, the city and county contended that Land Watch had misunderstood "the basis

---

[9] The forecast must, of course, be supported by an adequate factual basis and may be challenged to demonstrate how its approach in creating its forecast is reliable. *See, e.g., Meyer v. Douglas County,* 61 Or LUBA 412, 416 (2010); *Friends of Marion County v. City of Keizer,* 45 Or LUBA 236, 248-50 (2003).

[10] Specifically, Land Watch contends that the REA "added Scenario A's 68.7 acres and Scenario B1's 51.4 acres, resulting in a total industrial land need of 120.1 acres accommodating a total of 1,272 jobs (809 [industrial jobs] + 463 [industrial jobs])." (Emphasis omitted.)

behind" the REA. They proposed a different understanding of the calculations:

> "[T]he REA * * * recognizes that an EOA based simply on anticipated economic growth derived strictly from expected population growth does not capture all the types of economic growth that can and will normally occur in a region. A regional analysis is based on the fact that there are types of industries that will seek to locate substantial facilities in a region and that have a tremendous flexibility as to where they can locate. Once the decision is made to locate in a region, the employers are opportunistic shoppers, seeking immediately available properties and will turn their attentions elsewhere if, for example, assembly of smaller parcels or major land use procedures need to occur before development can happen. *See,* R.753 (discussing approach of large-site industrial regional employers)."

The city and county asserted that the REA did not double-count projected employment growth, because the REA considered "additional large site employers that might otherwise locate somewhere else on the west coast but may locate in Coburg if the conditions are right." (Underscoring in original.) Therefore, they maintained, the REA did not reuse the same subset of employment-based need, but rather included additional regional need that had not already been included in the EOA calculation.

LUBA reviewed for substantial evidence and concluded that Land Watch failed to demonstrate that there had been a "double-counting of large-lot industrial jobs." We reiterate that the scope of our review is not to reexamine evidence or the strength of that evidence but rather review to ensure that LUBA understood and applied the substantial evidence standard correctly. Here, LUBA understood the city to assert another explanation for its projected employment-based land need. The city responded that it was not "double-counting" employment needs or jobs that had already been accounted for in the REA. The city's calculation anticipated a different source of jobs—jobs that had not already been included in the EOA. LUBA concluded that Land Watch did not demonstrate that the calculations reflected the error that Land Watch had asserted. Under

our standard of review, we conclude that LUBA did not misapply the substantial evidence standard.

For all those reasons, we affirm as to the petition and cross-petition.

Affirmed on petition and cross-petition.